# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CHRISTOPHER ERIC POORE,
Defendant and Appellant.

S104665

Riverside County Superior Court
INF-033308

June 27, 2022

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Kruger, Groban, Jenkins, and Guerrero concurred.

Justice Liu filed a concurring opinion.

PEOPLE v. POORE

S104665

Opinion of the Court by Corrigan, J.

Defendant Christopher Eric Poore shot and killed Mark Kulikov and took two carloads of his property. He was convicted of first degree murder, robbery, burglary, and firearm possession by a felon.[1] The jury found that defendant had fired a gun and committed the murder for financial gain and by means of lying in wait[2] but rejected all gang enhancement allegations.[3] The penalty was set at death. The court denied a motion to modify the death verdict, imposed a $10,000 restitution fine, and stayed additional sentences totaling 41 years to life in prison. We affirm the judgment.

## I. BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

##### a. Planning

In 1998, defendant was housed in Pelican Bay State Prison (Pelican Bay). Prison authorities had "validated" him as

---

[1]   Penal Code sections 187, subdivision (a), 211, 459, and 12021, subdivision (a)(1).

[2]   Penal Code sections 190.2, subdivision (a)(1) and (a)(15), 12022.5, subdivision (a), 12022.53, subdivision (d), 1192.7, subdivision (c)(2) and (c)(8).

[3]   Penal Code section 186.22, subdivision (b)(1). All further statutory references are to the Penal Code unless otherwise specified.

an associate of the Aryan Brotherhood, a white supremacist gang.[4] While awaiting parole, defendant told inmate Michael Hammett, another Aryan Brotherhood associate, that he wanted to become a full member of the gang and a "shot caller." Typically, Aryan Brotherhood aspirants were required to commit violent crimes to gain entry. Once released, defendant planned to earn membership by "tak[ing] care of" some undisclosed business for the gang. Hammett put defendant in touch with his wife, Kathleen O'Donnell. O'Donnell frequently acted as a go-between for Aryan Brotherhood inmates and people outside prison.

When paroled, defendant flew to Crescent City to help O'Donnell move, and the two began a romantic relationship. Because this trip violated the terms of his parole, defendant was briefly reincarcerated at the California Institute for Men at Chino.

In the fall of 1999, defendant was out of jail and living in a Palm Springs townhouse that belonged to his mother's fiancé. He drove a new Jeep and kept a DeLorean in the garage. He was romantically involved with Melinda McGuire, a methamphetamine user who spent time at her friend Mark Kulikov's house. Kulikov also occasionally allowed Debra Feller and Brian White to stay there. McGuire introduced Kulikov to defendant, who began visiting the home.

---

[4] A prison gang expert testified that a person is "validated" as a gang member if the Department of Corrections and Rehabilitation receives "tangible, credible information" from at least three different sources tying the person to the gang.

b.  The Murder and Related Crimes

McGuire went to defendant's townhouse on November 6, 1999, and the next day they visited her sister, Cherice Wiggins. Wiggins was trying to sell a .32-caliber Colt revolver, and defendant expressed interest in buying it.  He said he wanted the gun to confront someone named Morris.  Morris McCormies was another person who frequented Kulikov's home.  Wiggins either loaned defendant the gun or allowed him to pay for it later.  She gave him the weapon and ammunition inside a black plastic box.

On November 8, defendant and Jamie Wolden drove to Kulikov's house looking for McCormies, who owed Wolden money.  Kulikov was home with two visitors, Debra Feller and Gary Richards.  Kulikov gave Wolden a beer, then walked into the bedroom with defendant.  Shortly thereafter, Wolden joined them.  Defendant asked Kulikov for drugs or money, but Kulikov said he had none.  He invited defendant to take his stereo, television, or anything else that he could pawn.  Defendant protested that he needed more because "he was about to lose his Jeep."  Although the men had been conversing calmly, defendant suddenly pulled a revolver and shot Kulikov several times. Kulikov, who was unarmed, never rose from his chair.  As defendant left the room, he told Wolden that Aryan Brotherhood members had told him to commit the murder.  He reminded everyone in the house that "his bros get out on parole every day," which Wolden understood as a threat to anyone who "snitch[ed]."

Defendant removed the empty shell casings, put them in his pocket, and reloaded the revolver.  He directed Wolden and Richards to take two large stereo speakers to his townhouse.  He

covered Kulikov's body with a blanket, ordered Debra Feller to pack her things, and asked where he could find a floor safe that he believed contained drugs and jewelry. Feller said there was no safe but defendant refused to believe her, and they looked for it throughout the house. Defendant collected electronics equipment and other valuables, packing them in large boxes.

Wolden and Richards drove to defendant's residence as instructed and unloaded Kulikov's speakers in the garage. Richards remained at the townhouse with McGuire, and Wolden drove back to Kulikov's house. Once there, Wolden called defendant names, expressing his displeasure about the murder, then walked home.

Brian White arrived at Kulikov's house around 4:00 p.m. Defendant displayed his gun, and Feller told White, "Just do what he says." Defendant said the Aryan Brotherhood had ordered him to kill Kulikov and take his drugs because Kulikov was not doing enough to help people in the gang. White did not believe this explanation but helped defendant search the house. White and Feller then drove more of Kulikov's possessions to the townhouse. McGuire was at the townhouse and noticed Feller crying. Feller told her that defendant had shot and killed Kulikov. Confronted by McGuire, defendant replied, "He's just asleep, asleep for good." He told McGuire he shot Kulikov five times but refused to explain why.

Later that evening, White and Feller drove back to Kulikov's house to retrieve their own belongings. Once away from defendant, they drove to Yucca Valley and ultimately decided to contact the police.

Around 8:30 or 9:00 p.m. the next night, defendant and McGuire went to the home of Jo-Lin Ferdinand and Cameron

Blodgett. The couple was away on vacation, and defendant had been house-sitting for them. At one point, McGuire heard defendant moving bricks or rocks on the patio. Later she noticed that defendant no longer had her sister's gun. He explained that he had buried it.

### c. Arrest and Investigation

An anonymous caller told police someone was dead in Kulikov's house. Responding officers entered through the unlocked back door. They discovered Kulikov's body in the master bedroom, slumped on a chair and partially covered by a comforter. He had been shot three times in the face, twice in the chest, and once in the hand. The house was in disarray, and his vehicle was missing.

Later that evening, White and Feller called the Palm Springs Police Department to report the murder. Detectives interviewed them separately and arrested White for a parole violation. Feller led detectives to defendant's empty townhouse, then later recognized defendant's Jeep parked in Blodgett's driveway. The officers obtained Blodgett's phone number and had Feller call it as a ruse to get defendant to leave the house. It worked. Defendant asked Feller if something was wrong, then hung up. Shortly afterward, defendant and McGuire left the residence and were taken into custody.

Police searched the townhouse and found a black plastic gun box containing .32-caliber ammunition. Five expended .32-caliber shell casings were recovered from a trash bag. Stereo equipment, speakers, cameras, a television, and other items belonging to Kulikov were located in the townhouse and garage. Kulikov's truck was seized from the Morongo Valley residence where White and Feller had parked it.

The Blodgett-Ferdinand house was also searched. Looking under some missing bricks and freshly turned dirt in the backyard, a detective found a .32-caliber Colt revolver with six live rounds in the cylinder. Ballistics matched the expended cartridges from the trash bag to the recovered Colt. Bullets recovered from the crime scene could have been fired from the Colt but were too damaged to yield a definitive match.

Defendant talked about the murders while in the county jail. Seeing Steven Pearson's Aryan Brotherhood tattoo, defendant told Pearson he had tried to become a member by robbing a drug dealer for the gang. Instead, "he got frustrated and shot the guy in the head and chest" while the victim was sitting in his bedroom. Defendant said he took the man's property and hid the gun under some bricks at another house. He also confessed to his cellmate, Neal O'Neill, saying he shot a man in the body, hand, and head while in the back bedroom of the man's house. He claimed to have been acting as "a hitman for the Aryan Brotherhood." Afterward, he had hidden the gun underneath a brick in a backyard patio.

d. Efforts to Intimidate and Eliminate Witnesses

Defendant wrote McGuire a letter from jail instructing her to testify he had not obtained a gun from her sister and that she never knew him to possess any gun. He opined that any contrary statements she had given to the authorities were "bullshit" and must have been coerced. Rather than give false testimony, McGuire turned the letter over to the police.

In January 2000, defendant's sister mailed Kathleen O'Donnell a packet of police reports and related materials in the Kulikov murder case. At that time, O'Donnell and defendant communicated about his case almost daily. O'Donnell

highlighted portions of the documents reflecting Brian White's cooperation with police and child molestation charges that had been dismissed. Testimony from a longtime Aryan Brotherhood member and other associates established that this paperwork was a "death warrant" for White. At defendant's direction, O'Donnell sent the annotated packet and White's mug shot to Kenneth Cook, a gang associate who was in the same prison where White was incarcerated for his parole violation.

Defendant and Cook had been in the county jail together before Cook was transferred to Chino state prison. Defendant told Cook five witnesses in his case needed to be "dealt with," meaning killed. He said his sister would mail Cook the information. In return, defendant promised Cook a new Jeep and other items. Cook never received the "death warrant" packet. But, from a conversation with White on the yard, Cook realized that White was one of the witnesses defendant had targeted. Cook was worried that if he did not kill White, he could be killed himself. Cook was soon transferred to a different prison, however, and did not have an opportunity to act.

Defendant also sought help from fellow Riverside jail inmates Steven Pearson and Neal O'Neill. Defendant reported where White was incarcerated and asked if Pearson knew any Aryan Brotherhood associates who would "take care of" White for him. He promised to have his sister put money in their prison accounts in payment for White's murder. After Pearson demurred, defendant offered his cellmate, O'Neill, a Jeep and a DeLorean to kill the witnesses against him. He suggested the male witnesses should be shot and the female witness injected with a drug overdose.

Defendant also wanted to use O'Neill's nitroglycerin heart medication to kill someone in the Indio County jail, where defendant had been transferred. O'Neill refused to give up his pills. O'Neill later realized the pills were missing and alerted jail authorities to defendant's plan. Corrections officers searched defendant's cell and found a pharmacy bottle of nitroglycerin pills in his property box. Defendant was returned to the Riverside County jail, strip-searched, and X-rayed. The X-ray revealed a bindle hidden in defendant's rectum containing tobacco, cigarettes, a lighter, and an improvised syringe.

2. *Defense Evidence*

Defendant testified, admitting prior convictions for burglary, grand theft, methamphetamine possession, and felonious possession of a firearm. He had been incarcerated at several facilities, including Pelican Bay. He denied belonging to the Aryan Brotherhood but conceded prison authorities had validated him as an associate. After his parole, his family gave him housing and paid his bills.

Defendant claimed that two or three days before the murder he purchased speakers and stereo equipment from Kulikov for $1,000. Kulikov promised to deliver the items to him. Another witness recalled that defendant had offered Kulikov a $150 down payment for the equipment.

On November 7, while he was visiting McGuire's family, Cherice Wiggins said that she had a Colt revolver for sale. Wanting to buy the gun as a present for his mother's fiancé, he promised to pay Wiggins $200 when his mother returned from vacation. He locked the gun inside a toolbox in his Jeep.

The next morning, Wolden asked defendant for a ride to Kulikov's house. When they were halfway there defendant

changed his mind about accompanying Wolden. Instead, he drove to Blodgett's house, got out, and loaned Wolden his Jeep for the afternoon. He warned Wolden not to get pulled over because there was a gun in the Jeep's toolbox.

Defendant said he arrived at the Blodgett's house shortly before noon. The couple had recently given him a key, so he went inside, made coffee, and talked with them for a while. He then spent the rest of the day working on Blodgett's truck, cleaning the yard, and building a dog run. He stayed there until after 4:00 p.m. Blodgett testified, however, that the yard work was done earlier that weekend and defendant did not work on the truck. Blodgett and Ferdinand both recalled defendant arriving and making coffee, but they became busy and could not say exactly where defendant was in the house or what time he left.

According to defendant, Debra Feller and Brian White came to the townhouse in Kulikov's truck and delivered the stereo equipment defendant had purchased. They also dropped off boxes of personal items defendant had agreed to let them store there. White and Feller left in Kulikov's truck around 6:30 or 7:00 p.m. Defendant and Blodgett met at a local pub around 9:00 p.m. Except for a brief period around 10:00 or 11:00 p.m., when he took McGuire back to the townhouse, defendant was with Blodgett until around 2:30 in the morning.

Defendant and McGuire went to Blodgett's house the next evening to feed the pets and housesit. Defendant worried the police were coming when he saw a figure in a suit run across the backyard. He admitted taking the gun from the Jeep and burying it under the brick patio.

9

Steven Pearson's county jail cellmate testified that Pearson had a reputation as a "snitch" who made up stories to gain favor with the authorities. Eleaza Mead testified that Debra Feller was laughing about the murder and defendant's arrest. According to Mead, Feller said defendant had not committed the murder but was the most likely person to be blamed. Robert Hamilton testified the police pressured Jamie Wolden. Wolden told him the police were going to charge him if he did not name defendant as Kulikov's killer. On rebuttal, the prosecution introduced Hamilton's previous statements. Hamilton initially told police that Wolden said he did not know who shot Kulikov. Later, Hamilton disclosed that Wolden said defendant committed the murder.

## B. *Penalty Phase*

The prosecution presented evidence of defendant's violence in custody. The jury also heard victim impact testimony from Kulikov's family. The defense declined to cross-examine any of these witnesses and presented no penalty phase evidence or argument.

### 1. *In-custody Behavior*

#### a. California Medical Facility, Vacaville (1993)

On May 29, 1993, while serving a sentence for firearm possession, defendant was housed at the California Medical Facility in Vacaville. There, he struck inmate Roger Pyatt in the mouth, knocking out his dentures. Defendant later admitted the assault, claiming Pyatt had insulted him in front of other inmates. Pyatt suffered from serious mental illness and developmental disability, which were evident to all inmates and staff. Most other inmates either ignored Pyatt's odd behavior or tried to protect him.

b. California State Prison, Calipatria (1994–1995)

Defendant committed several assaults and weapons violations while incarcerated at the Calipatria State Prison on another gun charge.

On August 22, 1994, officers heard noises coming from defendant's cell. They arrived to find defendant's cellmate, Foster, with a swollen eye; defendant was uninjured. The two began fighting again and did not stop until officers activated an alarm. Defendant said he and Foster " 'were not getting along' " and admitted, " 'I just got a lucky punch in.' "

On April 16, 1995, defendant and his cellmate Bennett participated in a prison yard melee along with a number of other inmates. Bennett and others used weapons. Ignoring repeated commands and warning shots, the group did not desist until a correctional officer produced a rifle.

On May 21, 1995, defendant was with inmate Burke in the prison yard. Inmate Collins attacked Burke with fists and a weapon. The two continued fighting until a corrections officer fired a rubber round from his gas gun. While all the inmates lay prone at the officer's command, defendant jumped up and kicked Burke in the head. He did not stop until the officer loaded a rifle.

On June 7, 1995, defendant and his white cellmate Bennett fought with two African-American inmates who entered the yard. Defendant fought inmate Carroll, punching, then slashing and stabbing at him. One officer ordered them down and another fired a rubber bullet directly at defendant, stopping the fight. Defendant threw his weapon toward the fence, where it was recovered. Carroll sustained lacerations and puncture wounds to the chest, stomach, and arm.

Defendant was involved in a similar fight on July 4, 1995. When two African-American inmates entered the yard, defendant and his cellmate Bennett immediately attacked them. The men disregarded orders to stop, and officers fired rubber rounds at them. Bennett's fight ended, but defendant and inmate Thomas continued punching each other even after officers deployed tear gas. More rubber bullets were fired to finally end defendant's attack.

On November 15, 1995, officers found a weapon fashioned from razor blades in defendant's cell. The blades had a handle at one end made from masking tape and thread. A sheath made from a milk carton and tape covered the blades. The weapon was hidden on defendant's shelves, inside an envelope addressed to him.

The following week, on November 24, 1995, defendant was involved in another interracial fight, when he and another inmate attacked African-American inmates Tolliver and Hyder. The men ignored commands and the firing of rubber bullets, stopping only after officers threw tear gas into the yard.

On December 10, 1995, officers found contraband razors hidden in the garbage and inside a towel in defendant's shelving unit.

On December 19, 1995, defendant initiated a fight with inmate McCarter. Rubber bullets and tear gas were required to stop the fight.

c. California State Prison, Corcoran (1996)

The following year, defendant was convicted of weapon possession as an inmate (§ 4502) and incarcerated at the Corcoran State Prison. His in-custody violence continued. On October 19, 1996, he attacked inmate Hernandez on the yard.

They continued fighting after officers fired a wooden round. Inmate Burns intervened and hit defendant, who struck Burns and returned to punching Hernandez. The fight ended when officers fired another round.

A little over two weeks later, on November 4, 1996, defendant fought with inmate Munoz in the prison yard.

### d. Riverside County Jail (2000)

Defendant joined a fight in the Riverside County jail while awaiting trial on the current charges. On February 16, 2000, several men from another jail were brought into a holding cell. Defendant backed an African-American inmate named Clarence Keyes into a corner and began punching him. Keyes curled into a fetal position, trying to protect himself. Defendant punched him 10 to 12 times before finally obeying deputies' orders to stop.

### 2. *Victim Impact*

Several members of Kulikov's family testified about the impact of his murder. Kulikov was 42 years old when he died and was the only son of Frances and Alex Kulikov. After surviving rheumatic fever as a child, Kulikov grew especially close to his mother. They talked regularly on the phone, including the morning of his death. Before he moved away to Palm Springs, Kulikov worked with his father on the family's Arizona produce farm.

Kulikov's parents and one of his three sisters were traveling to a family member's funeral in Pismo Beach when they learned of his death. They initially thought Kulikov had been killed in a car accident because he had planned to drive to the funeral. Learning from the news that he had been murdered, Kulikov's parents were devastated. His mother was medicated for depression, and his father was saddened that

Kulikov did not live to carry on the family name. Kulikov's sisters described their close relationships and the pain his killing caused.

Kulikov's wife of nearly 20 years, Joie, testified about their whirlwind courtship and wedding. She said Kulikov was a kind, generous, supportive husband, and a devoted father to their daughter. They had moved to Palm Springs shortly before their daughter started kindergarten and were in the same house when she left for college, just a few months before the murder. Around that time, Kulikov's behavior changed. He was preoccupied and began entertaining new friends at the house while she was away at work. Joie moved out of the house about two months before the murder, trying to persuade Kulikov to break away from his new friends. She was in denial upon learning of the murder and felt lonely and sad that they would not grow old together.

Kulikov's daughter described happy memories of her father. They talked often and she was proud of him. Learning of her father's death while she was away at college was devastating. She had nightmares afterward and thought about him daily.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Physical Restraints*

After a hearing, the court ordered that defendant wear a REACT stun belt and be confined to a specially constructed restraint chair during trial. Defendant contends these restraints inflicted pain, caused his absence from part of the trial, "likely interfered with his ability to communicate with his counsel, compromised his ability to concentrate on his trial[,]

and affected his demeanor before the jury when he testified at the guilt phase." He argues their use violated numerous constitutional rights.[5] Ample evidence supports the court's finding of manifest need, and the court acted within its discretion in selecting the restraints employed.

### a. Background

Before trial, the prosecution moved for defendant to be restrained during the proceedings. The motion represented that defendant had threatened to kill witnesses and sought help from other inmates to do so. While in custody, he committed numerous acts of violence. He smuggled both contraband and improvised weapons, including an improvised syringe with which he planned to kill a witness. To ensure courtroom security, the prosecution urged that defendant wear a REACT belt and be shackled to a chair affixed to the floor. The defense opposed all restraints, asserting the only acceptable security options were to have more bailiffs in the courtroom or to move defendant's chair farther away from the witness stand.

At the hearing, the prosecutor argued he was not obliged to present evidence in support of his motion. He relied on a footnote from *People v. Duran* (1976) 16 Cal.3d 282, 293, footnote 12 (*Duran*), which described the decision to impose restraints as "a judicial function in which the prosecutor plays no necessary part." The court rejected the argument, explaining that a finding of manifest need for restraints had to be based on competent evidence. The prosecutor then drew the court's

---

[5] Although defendant's briefing does not state with specificity, he appears to be raising claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

attention to the People's Notice of Intent to Introduce Evidence in Aggravation, which described defendant's solicitations to have witnesses killed, his acquiring of materials to make a nitroglycerin "hot shot," and his many fights and weapons violations in custody. After further argument, the court stated, "I'll make a finding at this time that there is good cause, based upon the totality of the facts and circumstances, that there be restraints." However, the court declined to rule on the type of restraints that would be ordered until it heard from security personnel on the "evident necessity for the restraints and the type of restraints . . . available." The next day, the court announced that case law required it to conduct a hearing, make factual findings concerning the need for restraints, and weigh the benefits and burdens of shackling against less restrictive alternatives. The court then heard testimony.

Officer Miramontes, a correctional corporal at the Indio jail, described defendant's custodial history. At Pelican Bay, defendant had been placed in a secure housing unit, the highest prison security level. Only high-ranking gang members or inmates with a history of assaulting other inmates are typically placed there. Defendant's file indicated he had been validated as an Aryan Brotherhood associate at both Pelican Bay and Tehachapi state prisons. He had disciplinary markers at Riverside County jail for assaulting inmate Clarence Keyes, "slipp[ing] his handcuffs," possessing nitroglycerin pills that did not belong to him, and secreting a syringe, tobacco, and lighter inside his body. The syringe was considered a weapon, and the pills could be used to poison another inmate. He also fought with his cellmate. Due to his many assaults on other inmates, defendant was placed in administrative segregation housing, was allowed no inmate contact, and was kept handcuffed outside

his cell. Miramontes noted that inmates were not searched when leaving the jail for court, and the jail had no X-ray machine that could detect a weapon hidden inside the body. Although defendant always treated staff with respect, Miramontes believed he needed to be restrained in the courtroom because he would be a risk to inmates who testified against him.

Miramontes explained that a REACT belt can deliver a painful shock one to two seconds after an initial warning beep. Captain Patrick Tyrrell of the Riverside Sheriff's Department testified that, based on his 30 years of experience, the delay between perception of a danger and activation of the REACT belt is enough time for an attack to occur. Former Riverside County Sheriff's Deputy David Bowser agreed that this delay made reliance on the REACT belt problematic in defendant's case.

Bowser, now an investigator with the district attorney's office, testified about the evidence showing defendant had solicited witness Brian White's murder. Prison officials had intercepted a packet of documents defendant's sister and Kathleen O'Donnell had sent to inmate Kenneth Cook. The packet contained photographs of White and highlighted police reports describing child abuse allegations against White that had been dismissed. Former Aryan Brotherhood member Brian Healey informed Bowser that the green highlighting and the packet in its entirety represented a death warrant against White. The prosecution also played audiotapes Bowser had obtained of monitored conversations with a visitor in which

defendant talked about inmates he wanted to kill and how he would conform his conduct until he got the chance to explode.[6]

Finally, Leo Duarte, a special agent with the Department of Corrections and Rehabilitation, testified about defendant's prison record and gang affiliation. Defendant was an Aryan Brotherhood associate and was trying to become a full member. Any assault on a witness, courtroom officer, prosecutor, or law enforcement officer would enhance defendant's status within the gang and further his membership goal. Duarte reviewed the records of defendant's incarceration from 1990 to 1997, noting there were "well over 25" disciplinary incidents. Defendant frequently refused to comply with instructions, possessed contraband weapons, and fought with other inmates, sometimes stabbing them. Duarte listed some of these incidents for the record.

After testimony concluded, the parties discussed seating defendant in a special chair with a waist belt. Defense counsel protested that such a chair would prevent defendant from standing with the rest of the courtroom when the jury entered and departed. He urged that defendant "should have no more than the REACT belt." The prosecutor argued the chair should be bolted to the floor. At a later hearing, the court announced its tentative inclination to seat defendant in the restraint chair

---

[6] As one example, defendant told a visitor: "It just happens like that you know. Just frustration with this place and the cops and you know my situation in general; you know what I mean? Just builds up and I shove it all down, shove it all down, put my smile on you know, shove it all down, till the chance that I get to explode. Ahhha-ha-ha! Then they wonder why I beat people half to death. (laughs) When I'm done I'm like, ahhhhha-ha. It's almost like a cigarette after sex! (laughs)."

with a REACT belt. The chair resembled other chairs at counsel table except that it had a hole in the lower lumbar area, which was hidden when someone sat in the chair. The prosecutor again sought to have the chair bolted to the floor, observing he had found it "relatively easy" to stand when he tested the chair, but the court responded that the REACT belt and additional courtroom personnel would be sufficient. In light of the court's decision to use the chair, defense counsel withdrew his offer to stipulate to use of the REACT belt and objected to the use of any restraints whatsoever. Nevertheless, the court found there was manifest need, based on "the totality of the facts and circumstances," to restrain defendant with both the security chair and the REACT belt. At defense counsel's suggestion, however, the court ordered that defendant and all counsel remain seated when jurors entered or left the courtroom.

### b. Analysis

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645]), and its decisions on these matters are reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 633 [101 Cal.Rptr.3d 14, 218 P.3d 272].) However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322].) Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest" — such as the interest in courtroom security — specific

to the defendant on trial.' (*Deck v. Missouri* (2005) 544 U.S. 622, 624 [161 L.Ed.2d 953, 125 S.Ct. 2007], italics omitted.) We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219 [124 Cal.Rptr.2d 161, 52 P.3d 95].)" (*People v. Lomax* (2010) 49 Cal.4th 530, 558–559 (*Lomax*).)

"In determining whether there is a manifest need to restrain the defendant, courts consider several factors, including evidence that the defendant poses a safety or flight risk or is likely to disrupt the proceedings." (*People v. Simon* (2016) 1 Cal.5th 98, 115 (*Simon*).) Although no formal hearing on the matter is required (*Lomax*, *supra*, 49 Cal.4th at p. 559), "when the use of restraints is based on conduct of the defendant that occurred outside the presence of the trial court, sufficient evidence of such conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints. [Citation.] The court may not, we have emphasized, merely rely on the judgment of law enforcement or court security officers or the unsubstantiated comments of others." (*Simon*, at p. 115.) Finally, when the evidence establishes a manifest need for restraints, the court should impose the least obtrusive or restrictive restraint that would be effective under the circumstances. (*Ibid.*; see *People v. Mar*, *supra*, 28 Cal.4th at p. 1226.)

Defendant first complains the court's decision to impose restraints was based solely upon the prosecutor's unsworn allegations of dangerousness. This argument is based on the court's statement at the close of the first hearing that "at this time" it found "good cause, based upon the totality of the facts

and circumstances," to impose some type of restraints. The court made this announcement after hearing the prosecutor describe the violent incidents the People intended to present in aggravation, including defendant's many in-custody fights and weapons violations along with his attempts to have witnesses killed. Read in context, the statement appears to reflect the court's tentative view, pending confirmation of these incidents through evidence presented to the court. It began that inquiry the next day.

The record indicates the court well understood its obligation to base its decision on evidence and not merely the representations of counsel. (See *People v. Cox* (1991) 53 Cal.3d 618, 651–652; *Duran, supra*, 16 Cal.3d at p. 291.) At the outset of the first hearing, the court disputed the prosecutor's assertion that he was not obliged to present evidence because a footnote in *Duran* stated that "[t]he imposition of restraints . . . is normally a judicial function in which the prosecutor plays no necessary part." (*Duran*, at p. 293, fn. 12.) The court required that "the showing . . . of manifest need for the restraints must be through evidence." They debated the issue at some length and, near the end of the hearing, the court repeated its concern that it had heard no testimony about the need for restraints or the type of restraints available. The prosecutor said he could provide further documentation of defendant's misconduct, and the court responded, "I think that would be advisable, . . . so that we can make an assessment of the evident necessity for the restraints and the type of restraints which are available through the sheriff's department." The debate continued at the start of the next hearing until the court insisted that it could not make a ruling until it had received evidence. The court told the prosecutor: "With respect to the issue of court security, it is

21

indeed the court's duty to provide for court security. But with respect to the *Duran* case and the footnote that you referred to earlier, that does not indicate that the People have no part in presenting the evidence before the court. Indeed, the court is not the party which presents evidence. *And if there is no evidence presented to the court, then the court cannot make a reasoned and intelligent decision.*"[7] The court went on to discuss a Court of Appeal case holding "that the court must conduct a prior hearing to determine the need for restraints, and must consider the defendant's history individually on the record." Thereafter, the court heard testimony from five witnesses before ultimately finding "manifest need" for the restraints it imposed. Considering the record as a whole, it is clear the court understood its obligation to base its ruling on evidence and proceeded accordingly.

Next, defendant contends the restraints were not justified and were improperly ordered as a general prophylactic measure. On the contrary, the court's conclusion was well supported. The court heard extensive evidence at the hearing about defendant's violent and dangerous behavior in custody. He solicited assistance in having witnesses killed, was repeatedly found with weapons in custody, had "slipped his handcuffs" while at the county jail, stole dangerous medication, and hid a syringe inside a body cavity. For the better part of a decade, he repeatedly assaulted other inmates, amassing a disciplinary record of "well over 25 incidents." Contrary to defendant's assertion that prior

---

[7] We note that the next sentence in the *Duran* footnote referred to by the prosecutor reads in part, "the prosecutor may bring to the court's attention matters which bear on the issue" of restraints. (*Duran, supra,* 16 Cal.3d at p. 293, fn. 12.)

violence or misbehavior outside the courtroom cannot establish manifest need, we have repeatedly upheld the use of shackles and other restraints when a defendant has assaulted other inmates or possessed weapons while in custody. (See, e.g., *People v. Miracle* (2018) 6 Cal.5th 318, 347 (*Miracle*) [four violent incidents in custody justified handcuffs and leg shackles]; *Simon, supra,* 1 Cal.5th at pp. 116–117 [possession of shanks and materials for making explosives justified stun belt]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1049–1050 [five jailhouse fights and possession of razors justified leg restraints]; *People v. Combs* (2004) 34 Cal.4th 821, 838 [possession of two shanks and threats against jail deputies justified leg restraints]; *People v. Hawkins* (1995) 10 Cal.4th 920, 943–944 (*Hawkins*) [three jailhouse fights and extensive criminal record justified restraint in a security chair].)[8] "The fact that these incidents occurred outside of the courtroom does not diminish their relevance or their support for the trial court's order." (*Miracle*, at p. 347.)

Defendant's in-custody fights and weapons offenses alone constituted "a record showing of violence" justifying the imposition of restraints. (*Duran, supra,* 16 Cal.3d at p. 291.) But there was more. The court heard evidence that defendant had solicited Aryan Brotherhood associates to kill Brian White, who would be one of the primary witnesses against him at trial. Defendant's assembly of this "death warrant," combined with

---

[8] Although defendant protests that some of his disciplinary incidents were remote in time, the evidence showed he was moved to administrative segregation while awaiting trial because of his frequent fighting. Defendant's persistent history demonstrates a long-standing record of violence, rather than a remote or isolated incident.

his demonstrated readiness to use violence, indicated he posed a significant threat to the witnesses testifying against him. A documented risk of violence against witnesses may also justify the use of restraints. In *People v. Livaditis* (1992) 2 Cal.4th 759, 775, for example, we upheld shackling during the testimony of a witness the defendant had held hostage and terrorized. And in *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 391–392 (*Bryant, Smith and Wheeler*), we concluded stun belts were permissible in a multidefendant trial to prevent escape attempts and potential assaults against prosecution witnesses. Although defendant protests that he never disrupted courtroom proceedings, the decision to impose restraints need not be based solely on a defendant's courtroom conduct. (*Hawkins*, *supra*, 10 Cal.4th at p. 944; *Livaditis*, at p. 744.) Defendant's compliance with court staff in pretrial proceedings did not necessarily foreshadow how he would behave when confronted with witnesses against him, some of whom he had threatened to kill or tried to have killed. The argument ignores defendant's own taped statements that when frustration at his situation builds up, he will "shove it all down, till the chance that I get to explode" and acknowledging that he "beat[s] people half to death."

Defendant also complains his restraints were excessive. "Generally, when physical restraints are called for, a trial court should impose 'the least obtrusive or restrictive restraint' that will ensure effective security." (*Lomax*, *supra*, 49 Cal.4th at p. 562.) Here, the court considered evidence from several witnesses about the appropriate available restraints. Miramontes, Tyrrell, and Bowser all described the delay between the supervising monitor's detection of impending danger, the REACT belt's activation, and ultimate delivery of a

shock. Tyrrell and Bowser each testified that this delay could allow sufficient time for the wearer to initiate an assault. Finally, Special Agent Duarte related that a courtroom assault would enhance defendant's status with the Aryan Brotherhood and might provide additional incentive to engage in such conduct. When asked, these witnesses agreed that the safest course to prevent attacks, absent chains, would be for defendant to wear the stun belt and be tethered to the floor. Another witness, Sergeant Susan Trevino, discussed the option of a security chair with restraints that would be apparent to the jury. The trial court had broad discretion to evaluate this evidence and decide which security measures were appropriate. (*Miracle, supra*, 6 Cal.5th at p. 348; see *People v. Stevens*, *supra*, 47 Cal.4th at p. 642.) Defendant had a lengthy history of violence. He stood well over six feet tall with an estimated weight nearing 250 pounds. Considering all the circumstances, we cannot conclude the court exceeded " 'the bounds of reason' " (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 390) by ordering that defendant wear the REACT belt and be confined to a chair. These security measures were less restrictive and obtrusive than the restraint chair Sergeant Trevino discussed.

### c. Prejudice

Defendant urges that the restraints were prejudicial because they were painful, which caused him to be absent from part of the trial, impaired his participation, and impugned the dignity of the courtroom. It is settled "that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson* (2001) 25 Cal.4th 543, 596 (*Anderson*).) We have concluded defendant's restraints were justified by manifest

25

need and the court did not err in imposing them. Even were a claim of error successfully made, the record does not support defendant's assertions of prejudice.

When jury selection was underway, defense counsel noted outside the jurors' presence that the security chair had been placed in its lowest position and defendant found it uncomfortable. The prosecutor said that, according to sheriff's deputies, the chair was most effective when placed in its lowered setting. The court declined to order the chair raised. The next day, defendant moved for reconsideration. He declared that he had a preexisting back injury that sometimes made him unable to get out of bed. He stated, "Because of my height and the position of my knees, keeping my chair as low as possible aggravates my back condition and makes my left leg go numb."[9] Finally, he predicted that continued use of the lowered chair could cause undue pain and prevent his attendance at trial. The court observed that the chair was meant to be used in its lowest position and should have been in that position from the beginning. Although it might reconsider the order if presented with evidence substantiating defendant's claims, the court did not find the declaration alone sufficient evidence of a back condition to justify a change in the chair's height. The court further observed that defendant's chair was of the same type as the others at counsel table and allowed defendant sufficient leg room under the table. While the seat of defendant's chair was lower than the others, due to his height he still sat taller than

---

[9] Various documents reflect defendant's height as six feet one inch, six feet two inches, or six feet five inches. During argument below, counsel did not make a specific record of defendant's height.

the attorneys. After this ruling, defense counsel conveyed defendant's request "to voluntarily absent himself from the proceedings until he can sit up," indicating the chair had caused pain and "problems" the night before. The court replied that defendant "can certainly voluntarily absent himself from the proceedings at any time. And if he wants to do that, he can do that."

When trial resumed four days later, the court noted that defendant was voluntarily absent. Defense counsel reported that defendant had previously instructed his attorneys to simply sit in court and put on no defense. Counsel was not concerned about defendant's absence during part of jury selection but noted, "at some point we need to have Mr. Poore here to decide what he's going to do . . . in this trial." Counsel planned to discuss the matter with defendant that afternoon. The next morning, defendant was again absent. Counsel reported that he had been unable to speak with defendant because jail officials had "taken [him] somewhere for x-rays." Voir dire continued without defendant's presence, but he returned to court the next day.[10] The following week, defense counsel said defendant had called from jail and "could barely speak" due to an illness that was also affecting a courtroom deputy. Although counsel conceded defendant had voluntarily absented himself from part of the voir dire once before, he believed defendant was required to be present for the actual selection of jurors. After reviewing

---

**10**    The record indicates the court had divided the entire panel into smaller groups for voir dire. After examination of each subgroup, the court entertained stipulations and challenges for cause. Defendant was present for a substantial part of the general voir dire, including that of the two panelists he asserts were wrongly excused for cause. (See, *post,* at pp. 32–41.)

the case law, the court agreed jury selection could not proceed further until defendant was present. It ordered that defendant be examined by a medical expert and called a recess until afternoon to permit this examination. Defendant had complained of nausea but had not requested a doctor. When proceedings resumed, defendant was present.

Defendant first complains his restraints caused such pain that they were presumptively prejudicial. Although it is true the state may not impose " 'wanton and unnecessary' pain" on inmates or pretrial detainees (*Hope v. Pelzer* (2002) 536 U.S. 730, 738), defendant presents "no authority for the proposition that, even when the need for shackling is manifest, the restraints must be removed if they cause discomfort." (*People v. Smith* (2015) 61 Cal.4th 18, 45.) Assuming such a claim is appropriate, it is unsupported here. Defendant asserted the security chair's height caused him back pain but presented no independent verification of his complaints. The court was not required to accept defendant's uncorroborated declaration at face value. The court invited the defense to submit additional evidence that the chair's position was inflicting pain, but none was forthcoming. Moreover, although defendant absented himself from trial for two days, he did not renew his complaints of pain after returning to court, even though the chair remained in its lowest position. Especially when, as here, there is no suggestion the jury saw the restraints,[11] we will not presume

---

[11] Because there is no indication the restraints were ever seen by jurors, defendant's claim that the restraints "violated the dignity and decorum of the courtroom" is similarly unsupported. Defendant faults the court for failing to ask jurors whether they saw the restraints, but doing so would have defeated the purpose of keeping the restraints concealed.

prejudice without evidence the restraints hampered the defendant's ability to participate in the trial. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 156; *Anderson, supra*, 25 Cal.4th at p. 596.) The record contains no independent evidence that the chair's height caused discomfort or that defendant's height, or any other condition, made such discomfort likely.

Nor did the court abuse its discretion in ordering that the chair be kept in its lowest position. The issue of restraints was discussed many times, and several witnesses testified about the best ways of securing defendant to prevent a courtroom attack. Some options were highly restrictive, like a security chair with visible restraints or a chair bolted to the floor. The court considered all of these options and chose a middle course, opting to use a security chair that was not affixed to the floor but was kept in its lowest position. The lowered seat height would have made it difficult for defendant to rise quickly from a seated position. Considering the testimony about reaction time delays in activating the stun belt, it was reasonable for the court to order a chair height setting that would provide the most security.

Defendant's related claim that the restraints negatively affected his demeanor also lacks support in the record. Defendant complains the stun belt had "the *possibility* of an impact on [his] mental faculties or demeanor" and that this

---

Defendant's additional complaint that the court should have instructed jurors to disregard any visible restraints is also unavailing. We have cautioned that such an "instruction should not be given unless requested by defendant," since it might draw attention to the restraints and create prejudice that might otherwise have been avoided. (*Duran, supra*, 16 Cal.3d at p. 292.) Defendant did not request the instruction.

"*potential* impact" warrants reversal of his conviction. (Italics added.) The phrasing of these claims reveals their speculative nature. Defendant points to no evidence whatsoever demonstrating that the restraints interfered with his ability to participate in the trial. Indeed, defendant testified at length in the guilt phase. There is no indication he suffered any impairment while doing so, nor did he ever voice such a complaint.

Finally, defendant contends pain from the restraints caused him to be absent from trial. The record does not support defendant's claim that his absence was related to any discomfort from the stun belt or security chair. After defendant complained about the chair height, proceedings did not resume until four days later. Defendant was voluntarily absent at that session and the next day, when defense counsel reported that he had been taken for X-rays. But the record does not demonstrate that this absence was due to continuing pain from one day of sitting in a lowered chair, followed by a four-day respite, as opposed to disaffection with the court's ruling. No evidence was ever produced as to what defendant's X-rays showed, and he returned to court the day after they were reportedly taken. When defendant was absent the following week, he complained not of back pain but of a respiratory or intestinal illness. There is no claim that this illness was related to the restraints.

To the extent defendant asserts error due to his absence itself, we conclude he waived his constitutional right to be present and the evident statutory error was harmless.

"A criminal defendant accused of a felony has the constitutional right to be present at every critical stage of the trial, including during the taking of evidence." (*People v. Bell*

(2019) 7 Cal.5th 70, 114 (*Bell*); see *Illinois v. Allen* (1970) 397 U.S. 337, 338.) Voir dire of prospective jurors is a critical stage for purposes of this constitutional right. (*People v. Wall* (2017) 3 Cal.5th 1048, 1059 (*Wall*).) However, a capital defendant may waive the constitutional right to be present, so long as the waiver is knowing, intelligent, and voluntary. (*Ibid.*; see *Bell*, at p. 114.) Defendant made such a waiver. Immediately after the court denied his request to raise the seat height, defendant conferred with his attorney, who conveyed, in his presence, defendant's request "to voluntarily absent himself from the proceedings until he can sit up." Thereafter, the court and defense counsel consistently described defendant's absence as voluntary. The record presents no reason to doubt the validity of defendant's waiver. There was no constitutional error. (See *Bell*, at p. 115.)

There was, however, statutory error under sections 977 and 1043, a point the Attorney General concedes. " '[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1).' ([*People v.*] *Jackson* [(1996)] 13 Cal.4th [1164,] 1210.) ' "Section 977 requires . . . that the defendant personally execute, in open court, a written waiver of the right to be present." ' (*People v. Romero* (2008) 44 Cal.4th 386, 418 [79 Cal.Rptr.3d 334, 187 P.3d 56].)" (*Wall, supra*, 3 Cal.5th at p. 1060.) Those requirements were not met. But in such an instance reversal is required "only if it is reasonably probable defendant would have obtained a more favorable result absent the error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (*Bell, supra*, 7

Cal.5th at p. 116; see *Wall*, at pp. 1060–1061; *People v. Weaver* (2001) 26 Cal.4th 876, 968.) Defendant was absent for part of the voir dire but was back in court when the parties exercised peremptory challenges and agreed upon the jury as sworn. Defendant does not explain how his attorneys' questioning of some prospective jurors might have differed had he been present, nor does he offer any other fact-based argument for how he might have suffered prejudice. Accordingly, "we find no reasonable probability in this case that a different jury would have been chosen or that the jury chosen would have reached a different verdict had [defendant] been present during" the entire voir dire. (*Wall*, at p. 1061.)

### 2. *Jury Selection*

#### a. Excusals for Cause

Defendant contends the court violated his state and federal constitutional rights to due process and a fair and impartial jury by erroneously dismissing two prospective jurors based on their death penalty views. Although the question is close, in light of the deference given to trial courts based on their ability to observe prospective jurors' intonation and demeanor, we conclude substantial evidence supports the court's rulings.

"Criminal defendants have a constitutional right to an impartial jury, and 'a prospective juror's personal views concerning the death penalty do not necessarily afford a basis for excusing the juror for bias.' [Citation.] Instead, consistent with the constitutional imperative, prospective jurors may be dismissed for cause only if their views on capital punishment ' "would ' "prevent or substantially impair" ' the performance of [their] duties as defined by the court's instructions and [their] oath." ' " (*People v. Turner* (2020) 10 Cal.5th 786, 810–811

(*Turner*); see *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*); *Witherspoon v. Illinois* (1968) 391 U.S. 510, 521–522.) A panelist's bias against the death penalty need not be shown with " 'unmistakable clarity.' " (*Witt*, at p. 424.) "Jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve." (*People v. Martinez* (2009) 47 Cal.4th 399, 426.) Indeed, some "prospective jurors 'simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these [prospective jurors] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 607 (*Beck and Cruz*).) Nevertheless, excusal is appropriate if, "the trial judge has been 'left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' ([*Witt*,] at p. 426; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1066 [210 Cal.Rptr.3d 667, 384 P.3d 693].)" (*People v. Armstrong* (2019) 6 Cal.5th 735, 751 (*Armstrong*).)

"Our review in this area is necessarily deferential because 'the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses, is best suited to reach a conclusion regarding the juror's actual state of mind.' (*People v. Jones* (2012) 54 Cal.4th 1, 41 [140 Cal.Rptr.3d 383, 275 P.3d 496]; see *Uttecht v. Brown* (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014, 127 S.Ct. 2218].) In applying deferential review, 'appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the

record.' (*People v. Stewart* (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271] . . . .) Accordingly, the trial court's determination as to the juror's true state of mind is binding on appeal if supported by substantial evidence. ([*People v.*] *Thompson, supra,* 1 Cal.5th at p. 1066; *Martinez, supra,* 47 Cal.4th at pp. 426–427.)" (*Turner, supra,* 10 Cal.5th at p. 811.)

Defendant's claim points to two panelists in particular. Their questionnaire and voir dire responses provide background for their ultimate excusal. Panelist N.S. indicated some support for the death penalty in her jury questionnaire. She responded, "For it," when asked for her feelings about the death penalty but did not elaborate. In response to the court's voir dire question, she explained that she agreed with the death penalty "[i]f the case is right" and "under certain circumstances." N.S. checked questionnaire boxes indicating the death penalty should "sometimes" be imposed for intentional killings and "usually" imposed for killings during a robbery or for financial gain. However, when asked to rate her support for the death penalty, she checked an option that stated, "I have no position for or against the death penalty; however, would consider the imposition of the death penalty in some cases." She also indicated that her views about the death penalty had changed, explaining that there were too many cases of wrongful imprisonment brought to light by DNA testing. In voir dire, she said she had seen a talk show featuring five men who had been released from prison after DNA exonerated them. Finally, when asked in the questionnaire what the death penalty accomplishes, N.S. wrote, "The only thing it really does is make the family of the murdered victim feel compensated."

Panelist J.W.'s questionnaire responses were equivocal. J.W. wrote: "If I felt the defendant was guilty <u>beyond any doubt</u>

I would be for the death penalty but would rather vote for life in prison." When questioned in voir dire, J.W. said she realized the criminal standard only required proof of guilt beyond a reasonable doubt. J.W. marked on the questionnaire that death was "sometimes" the appropriate punishment in some situations, "usually" appropriate for a killing during a robbery, and "never" appropriate for the killing of a relative. She checked a box indicating that she was in favor of the death penalty but would not always vote for death and would weigh the aggravating and mitigating circumstances. Even so, she was "somewhat" concerned that religious beliefs would impact her vote, explaining that she had never before "come face to face with a death penalty decision."

Later in voir dire, the prosecutor posed questions to a small group of panelists that included N.S. and J.W. After one panelist who was generally opposed to the death penalty confirmed that he could set aside those feelings, weigh the aggravating and mitigating factors, and impose death if it was warranted, the prosecutor asked how others felt about the death penalty. N.S. spoke up immediately, saying, "I'm for the death penalty, but I would have to be honest and say if it got down to the point that I had to say[,] 'Kill him,' I really can't honestly say. I don't know if I could do it or not." The prosecutor thanked her for the answer, and J.W. interjected, "Sir, I feel the same way she does." The prosecutor asked, "So when it comes down to it, you're not sure?" J.W. responded, "I am not sure if when it comes down to the nitty-gritty, whether I could do that, vote to kill him."

The prosecutor later returned to N.S., asking about her apparent reluctance to serve. N.S. explained: "Well, because of . . . the death penalty thing, I really . . . — I would — might be

doing an injustice, because even though he was found 100-percent guilty in every respect, I don't know if I could live with myself after saying I am putting someone to death. I don't know if I could live with myself." She then summarized, "I might be able to do it, but I don't know." Over defendant's objection, the court granted the prosecution's challenges and excused N.S. and J.W. for cause.[12]

The record supporting these rulings is thin, but we conclude it is sufficient to support the excusals. Although the jurors had expressed some degree of support for the death penalty in theory, each separately spoke up and volunteered a doubt that she could actually cast such a vote. "Even if a prospective juror's questionnaire responses express a willingness to consider the death penalty, an excusal for cause is appropriate if oral questioning establishes that the juror's views on capital punishment would, in fact, substantially impair her ability to return a death sentence." (*People v. Winbush* (2017) 2 Cal.5th 402, 429 (*Winbush*).) While the records supporting impairment are typically more robust than the one we encounter here, we have frequently upheld the excusal of panelists who doubt their own ability to vote to impose the death penalty despite their general support for it. In *Turner, supra,* 10 Cal.5th at page 813, for example, the court did not err in excusing a juror who "may have supported the death penalty in theory," but whose "voir dire responses made it clear she felt great reluctance about actually voting to impose it." The record was similar in *People v. Baker* (2021) 10 Cal.5th 1044 (*Baker*).

---

[12] When the jury was ultimately selected, neither side came close to exhausting its allotted peremptory challenges, with the prosecution using only half.

There, we upheld the dismissal of a juror whose questionnaire had professed openness to the death penalty but who equivocated in voir dire and, when asked if he could actually vote for death, ultimately answered, " 'I don't know.  I just don't know.' "  (*Id.* at p. 1086.)  Our death penalty cases are replete with similar examples of panelists whose excusals were upheld after they expressed doubts about their personal ability to vote for the death penalty even when objectively, in their judgment, the facts would warrant it.  (See, e.g., *People v. Suarez* (2020) 10 Cal.5th 116, 141 (*Suarez*) [" 'I am not sure if I could do this or not' "]; *People v. Miles* (2020) 9 Cal.5th 513, 564–565 (*Miles*) [" 'I don't know if I could follow the law.  There's . . . just a good chance that I would or I wouldn't.  You're going to have to pick me and have me sit here and see, because I just don't know' "]; *People v. Solomon* (2010) 49 Cal.4th 792, 831 [" 'I don't know.  I don't know' "].)

Defendant protests that a juror is not substantially impaired simply because she cannot predict how she would vote before hearing the evidence.  In a similar vein, he argues it is error to excuse a prospective juror who refuses to guarantee a vote for death.  (See *Armstrong*, *supra*, 6 Cal.5th at p. 756.)  But neither of these characterizations captures what N.S. and J.W. actually said.  The trial court carefully explained to the panelists that jurors only had a choice to vote for death under very limited circumstances.  If mitigating evidence predominated over aggravating evidence, they had to vote for life imprisonment without the possibility of parole.  If mitigating and aggravating evidence were equal, again, they had to vote for life imprisonment.  "Only if the aggravating or bad evidence is greater than the mitigating or good evidence [did they] have a choice."  The court explained that the law would not tell jurors

what to do but that they only had the option to vote for death when they found the aggravating evidence so substantial in comparison to mitigating evidence that death was warranted. These instructions accurately described the showing necessary before a death sentence could even be considered. Even so, N.S. and J.W. each interjected to voice doubts about whether she could realistically vote for death in any circumstance. "While it is true that a prospective juror is not disqualified merely because she would find it difficult to impose the death penalty" (*Turner*, *supra*, 10 Cal.5th at p. 814; see *People v. Merriman* (2014) 60 Cal.4th 1, 53), these panelists did not merely note the difficulty of reaching a penalty decision. They went on to question their actual ability to vote for death under any circumstances. "When a prospective juror repeatedly says he does not know whether he could realistically impose the death penalty, we will not second-guess the trial court's determination that the juror is substantially impaired." (*Turner*, at p. 815; see *Miles*, *supra*, 9 Cal.5th at pp. 565–567; *Wall*, *supra*, 3 Cal.5th at p. 1063.)

Defendant also argues the court should not have dismissed these panelists without probing their views through more questioning, in particular concerning whether they could set aside their beliefs and vote for death. Initially, we note that this argument misapprehends the reason the panelists were substantially impaired from serving. The basis was not that they opposed the death penalty and would have to consider whether they could nevertheless follow the instructions and impose that sentence if it was warranted. In fact, both women wrote in their questionnaires that they generally supported the death penalty, at least in some circumstances. The problem here was that, despite their theoretical support for the penalty,

both doubted that they themselves could cast such a vote. As N.S. said twice in that regard: "I don't know if I could live with myself."

We do agree, though, that the questioning of these panelists was sparse and probably approaches the minimum of what may suffice to support a cause excusal on appeal. "Before excusing a juror for cause, ' "the court must have sufficient information regarding the prospective juror's state of mind to permit a reliable determination" ' concerning whether the juror's views on capital punishment would impair his or her performance as a juror in a capital case. (*People v. Leon* (2015) 61 Cal.4th 569, 592 [189 Cal.Rptr.3d 703, 352 P.3d 289], italics omitted . . . , quoting *People v. Stewart, supra,* 33 Cal.4th at p. 445.) To ensure that its excusal of a prospective juror for cause is consistent with the constitutional standard, the court must make ' "a conscientious attempt to determine a prospective juror's views . . . ." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 652.) The questioning here, particularly of J.W., was minimal. After N.S. volunteered her doubts and J.W. spoke up to say she felt the same way, the prosecutor merely asked J.W. to clarify whether she was "not sure" if she could vote for death "when it comes down to it," and J.W. confirmed that she was "not sure" whether she could return such a vote. Neither the court nor attorneys for either side followed up on this response. J.W.'s demeanor may have made her inability to serve apparent to all in the courtroom. But the cold record seldom captures indications like facial expressions, tones of voice, or hesitancy in responding. The court and counsel should take care to ensure that the record captures these relevant but more nuanced and unvocalized pieces of information. As we have repeatedly reminded trial courts, prospective jurors should be questioned

at sufficient length to clearly establish their ability to impose the death penalty, and a thorough voir dire assists our review of *Witt* claims. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 860 (*Capistrano*); *People v. Stitely* (2005) 35 Cal.4th 514, 539.)

Nevertheless, "[t]he trial court was in the best position to observe [the panelists'] demeanor, vocal inflection, and other cues not readily apparent on the record, and we reasonably infer that the trial court based its decision not only on what [the panelists] said, but also on how [they] said it." (*People v. Flores* (2020) 9 Cal.5th 371, 388.) According substantial deference to the trial court, as we must (see *Uttecht v. Brown*, *supra*, 551 U.S. at p. 7), we conclude there is sufficient evidence to support the excusal of N.S. and J.W. for cause. These panelists had been advised of a capital juror's duty. With that standard in mind, and without being faced with a direct question, they each volunteered doubts about their ability to fulfill this duty. "If a prospective juror states unequivocally that he or she would be unable to impose the death penalty regardless of the evidence, the prospective juror is, by definition, someone whose views 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Witt*, *supra*, 469 U.S. at p. 424.)" (*Capistrano*, *supra*, 59 Cal.4th at p. 859.) Here, while the panelists did not state absolutely that they could not impose a death sentence, they clearly expressed doubts about their ability to do so even if the evidence warranted it. Under our precedents, their expressions of doubt demonstrated substantial impairment. (See *Baker*, *supra*, 10 Cal.5th at pp. 1086–1087; *Turner*, *supra*, 10 Cal.5th at p. 815; *Suarez*, *supra*, 10 Cal.5th at pp. 142–143; *Miles*, *supra*, 9 Cal.5th at pp. 565–566.) Tellingly, defendant did not seek to question these panelists below, nor does he suggest here

any questions that could have shed more light on the issue. The record is sufficient to support the court's ruling.

Finally, relying on the dissenting opinion in *Capistrano*, defendant suggests deference to the trial court is inappropriate because the record includes no reference to the excused panelists' demeanor. The voir dire process here was very different from the one we considered in *Capistrano*. There, the trial court conducted a preliminary screening and asked whether any panelists would be unable to impose the death penalty. It then excused, without further questioning, all who answered "yes." (*Capistrano*, *supra*, 59 Cal.4th at p. 854.) Over the dissent's criticism that this inquiry was insufficient, we concluded the panelists' unequivocal responses demonstrated their substantial impairment to serve as capital jurors. (*Id.* at p. 859.) We also concluded deference was owed to the trial court even though the questioning was brief. "The fact remains the trial court was present at the voir dire and we were not." (*Id.* at p. 860.) The voir dire here was more extensive than in *Capistrano*, encompassing questions from the court and counsel posed to a small group of panelists. The court had ample time to observe the demeanor of N.S. and J.W., both while answering questions and reacting to the answers of others. Moreover, deference to its ruling is appropriate even if the court did not specifically comment about their demeanor on the record. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 249.) Again, however, we emphasize that a more complete record of demeanor and other nonverbal information substantially assists the process of review.

b. Constitutionality of Death Qualification

Defendant next argues the process of disqualifying jurors who would not impose the death penalty violates due process and the right to an impartial jury and is inconsistent with the framers' understanding of the Sixth Amendment. Because he did not raise these objections below, they are forfeited. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 913; *People v. Howard* (2010) 51 Cal.4th 15, 26 (*Howard*).) They also fail on the merits. We have rejected similar challenges in previous cases, and defendant's new argument about original intent does not persuade us to reconsider our settled views.

Apart from his constitutional arguments, defendant suggests we reconsider *People v. Riser* (1956) 47 Cal.2d 566, which approved of the death qualification process in California. Although a literal reading of the cause challenge statute (Code Civ. Proc., § 229) does not require the exclusion of jurors who cannot or will not vote for the death penalty, *Riser* explained that permitting such jurors to serve would do violence to the purpose of the death penalty law and "would in all probability work a de facto abolition of capital punishment, a result which, whether or not desirable of itself, it is hardly appropriate for this court to achieve by construction of an ambiguous statute." (*Riser*, at p. 576.) We recently reaffirmed *Riser*'s holding (*Suarez*, *supra*, 10 Cal.5th at p. 138) and, finding no compelling reason to depart from it, do so again.

As defendant acknowledges, both this court and the United States Supreme Court have consistently upheld the constitutionality of the death qualification process. The exclusion of panelists who are substantially impaired from performing their duties as a capital juror does not violate the

Sixth Amendment's guarantee of an impartial jury. (*Lockhart v. McCree* (1986) 476 U.S. 162, 177–178; *People v. Taylor* (2010) 48 Cal.4th 574, 602.) The high court's decision in *Lockhart* "remains good law despite some criticism in law review articles. [Citations.] 'We may not depart from the high court ruling as to the United States Constitution, and defendant presents no good reason to reconsider our ruling[s] as to the California Constitution.' " (*Howard, supra,* 51 Cal.4th at p. 26.) Nor does the death qualification process violate capital defendants' constitutional right to a jury drawn from a fair cross-section of the community. (*Lockhart,* at pp. 173–177; *Suarez, supra,* 10 Cal.5th at p. 139; *Taylor,* at p. 603.) " 'Death qualification,' unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial. There is very little danger, therefore, . . . that 'death qualification' was instituted as a means for the State to arbitrarily skew the composition of capital-case juries." (*Lockhart,* at pp. 175–176, fn. omitted.)

Relying primarily on law review articles, defendant argues the high court's death qualification jurisprudence should be reexamined in light of the original understanding of the jury trial right. Because the practice of removing potential jurors who could not vote for death did not develop until the early nineteenth century, defendant argues it is too "recent" a development to command adherence today. He notes that the United State Supreme Court has reexamined much of its Sixth Amendment jurisprudence on this basis in the past 15 years (see, e.g., *Apprendi v. New Jersey* (2000) 530 U.S. 466

(*Apprendi*); *Crawford v. Washington* (2004) 541 U.S. 36) and overturned several venerable precedents in the process. That may be. However, this court is not the United States Supreme Court, and we are not empowered to alter federal constitutional law. Defendant's challenge to the *Witherspoon-Witt* framework is more appropriately addressed to the high court. (See *Capistrano*, *supra*, 59 Cal.4th at p. 864.) Because defendant raises no separate challenge to our holdings under the California Constitution, we have no occasion to reconsider those decisions.

## B. *Penalty Phase Issues*

### 1. *Absence of Penalty Phase Defense*

Defendant contends the absence of a penalty phase defense rendered his death verdict constitutionally unreliable. We have consistently rejected such claims and do so again here.

#### a. Background

Shortly after the jury returned guilty verdicts, defense counsel reported that defendant wanted to represent himself in the penalty phase. (See *Faretta v. California* (1975) 422 U.S. 806.) Asked how long his penalty phase presentation would last if the motion were denied, counsel responded that, based on his discussions with defendant, "my time would probably be zero."

At the next hearing, the court observed that defendant had no constitutional right to self-representation midtrial and asked him to explain the request. Defendant said he disagreed with his attorney's strategy for the penalty phase. Specifically, counsel "would attempt . . . to show mitigating factors that I don't approve of." Defendant said "the only thing" he wanted to defend against was "the gang allegations." Although he recognized the jury had just found the gang allegations untrue,

he believed his Aryan Brotherhood validation would be brought up again. "Other than that," he said, "I don't plan on putting on any mitigating evidence at all." Defendant wanted to call Richard Terflinger and Joseph Hayes on the "gang issues." He also thought they could testify as "character witnesses" for him. Guilt phase evidence revealed that both were Aryan Brotherhood members. Defense counsel disagreed with this strategy. The prosecutor also objected to testimony from these witnesses, whom he believed defendant wanted to bring to court for "an inappropriate reason."

The court observed that the *Faretta* request was untimely. It advised defendant that, pursuant to *People v. Bradford* (1997) 15 Cal.4th 1229 and *People v. Lang* (1989) 49 Cal.3d 991 (*Lang*), he could insist that no mitigating evidence be presented but would then be estopped from claiming ineffective assistance of counsel on appeal. The court also cited *People v. Bloom* (1989) 48 Cal.3d 1194 (*Bloom*), noting that defendant's desire to present no mitigating evidence had to be respected, despite counsel's opposition. Defendant affirmed for the record that he would be instructing counsel to present no mitigating evidence if the motion for self-representation was denied. After further argument, the court denied the *Faretta* motion, citing the lateness of the request and the quality of counsel's representation.

Defense counsel then informed the court that he would not be calling Terflinger or Hayes. Instead, pursuant to defendant's instructions, he would present no mitigating evidence. The court asked whether defendant was "asking the jury essentially to put him to death." Defendant answered, "No," and counsel said, "I don't know whether he's asking that or not, Your Honor, but he just says he doesn't want to put on any mitigating

evidence." The court stated that if defendant did not present mitigating evidence or argument, he would be effectively asking the jury to put him to death. Counsel responded, "I can't get into his mind, Your Honor. We have a good relationship . . . . But I cannot get into his mind, because I have talked to him at length about this very matter." The court encouraged counsel to review *Bloom*, *Bradford*, *Lang*, and several other cases, and set the matter for further consideration in the afternoon, explaining, "I need to know whether the defendant has made an intelligent choice in deciding that he does not wish his lawyer to present any evidence in mitigation. And so we may need to take a waiver with respect to that."

When they returned, defense counsel summarized cases holding that the client may choose to forgo a mitigation defense and counsel does not render ineffective assistance by complying with that choice. (See, e.g., *People v. Howard* (1992) 1 Cal.4th 1132, 1185–1186.) He then stated, "Mr. Poore has made it clear to me that he does not want me to present a . . . case in mitigation . . . . And, of course, if he wants me not to do that, I will not do that, and I will sit here and say no questions, no objections[,] and no final argument, I suppose." The court then questioned defendant as follows:

"THE COURT: Mr. Poore, you've heard what your attorney has just said; correct?

"THE DEFENDANT: Yes.

"THE COURT: Is that what you wish him to do?

"THE DEFENDANT: Yes.

"THE COURT: You understand that there may be some evidence which is mitigating evidence?

"THE DEFENDANT:  Yes.

"THE COURT:  And you understand that there may be some argument that your attorney can make which may convince the jurors that life without possibility of parole would be the appropriate penalty rather than death?

"THE DEFENDANT:  Yes.

"THE COURT:  But you don't wish him to make that argument; is that correct?

"THE DEFENDANT:  That's correct.

"THE COURT:  So it is your position that you are ordering your attorney not to present any mitigating evidence; correct?

"THE DEFENDANT:  Correct.

"THE COURT:  And you are ordering your attorney not to argue against the death penalty; correct?

"THE DEFENDANT:  Correct.

"THE COURT:  Knowing that the jury may order the death penalty, you do not wish to resist that; is that correct?

"THE DEFENDANT:  Correct."

The penalty phase proceeded, with the defense asking no questions on cross-examination.  When the prosecution rested, defense counsel announced that the defense waived its opening statement, would call no witnesses, and rested its case.  The proceedings were adjourned.  The next day, however, the court informed the attorneys it wanted to revisit defendant's decision not to present mitigating evidence.  The court explained it wanted to question defendant further about his decision to ensure it was knowing and voluntary.  Further, "I also wish to seek to persuade the defendant to change his mind, to encourage

him to consult further with counsel before making a final decision, and to advise him that his decision may, in fact, result in a verdict of death, and will not be a basis for reversal on appeal."

The parties returned in the afternoon. Defense counsel stated that he had spoken with defendant "once again about his right to present mitigating evidence, about the witnesses that we would call," noting that they had spoken of these subjects before. He reported that defendant still did not wish to present a case in mitigation. The court then inquired:

"THE COURT: All right. Mr. Poore, you understand that you have the right to present mitigating evidence in this case?

"THE DEFENDANT: Yes.

"THE COURT: You also understand that you have the right not to present mitigating evidence if you choose not to do so?

"THE DEFENDANT: Yes.

"THE COURT: What are your wishes in that respect?

"THE DEFENDANT: To not present any mitigating evidence at all.

"THE COURT: Is there anything which the court can do to convince you that you should present mitigating evidence in this case?

"THE DEFENDANT: No.

"THE COURT: Is there anything which has improperly influenced you not to present mitigating evidence?

"THE DEFENDANT: No.

"THE COURT: Has anyone threatened you or coerced you to not present mitigating evidence?

"THE DEFENDANT: No.

"THE COURT: Has anyone made you any promises to not present mitigating evidence?

"THE DEFENDANT: No.

"THE COURT: Have you discussed with [defense counsel] the existence of specific mitigating evidence?

"THE DEFENDANT: Yes. Thoroughly.

"THE COURT: Have you discussed their readiness to present that mitigating evidence?

"THE DEFENDANT: Yes.

"THE COURT: Have you discussed with [defense counsel] their recommendation that mitigating evidence be presented?

"THE DEFENDANT: Yes.

"THE COURT: I previously encouraged you to consult further with counsel before making a final decision concerning the presentation of mitigating evidence. [¶] Have you had an opportunity to speak with counsel concerning that?

"THE DEFENDANT: Yes.

"THE COURT: On more than one occasion?

"THE DEFENDANT: Yes.

"THE COURT: Has there been any change in your stance whatsoever with respect to the presentation of mitigating evidence?

"THE DEFENDANT: None, Your Honor.

"THE COURT:  You understand that your decision may, in fact, result in a verdict of death?

"THE DEFENDANT:  Yes.

"THE COURT:  You understand also that this decision to not present mitigating evidence may not only result in a verdict of death, but it will not be a basis for reversal on appeal?

"THE DEFENDANT:  Yes.

"THE COURT:  And knowing all of that, you still choose not to present any mitigating evidence?

"THE DEFENDANT:  Yes."

The court then asked defense counsel whether it would refrain from presenting mitigating evidence for any other reason besides defendant's choice.  Counsel responded in the negative, noting he had been prepared to call certain witnesses but defendant did not want them to testify.  Counsel stated, "The only reason I'm not presenting mitigating evidence is because he does not want mitigating evidence."  Counsel then explained that he did not accede to defendant's desire to call Terflinger and Hayes because he "did not feel that those two gentlemen would be witnesses that would help my case . . . if I were allowed to call them."[13]  Thereafter, counsel confirmed the defense would present no closing argument.

---

[13]  In proceedings held outside the prosecution's presence, defendant said Terflinger and Hayes could have shed light "from a different side" on his experiences in prison.  Defense counsel was of the firm view that the witnesses would harm the defense, however, because they would be questioned about their gang membership, their long prison terms, and "every bad thing that they had ever done in . . . prison."  He believed the gang allegations against defendant "would still be in the jury's mind,"

b. Analysis

Contrary to his position in the trial court, defendant now argues a "capital defendant cannot unilaterally waive his Eighth and Fourteenth Amendment right to have the jury consider mitigating evidence." He further contends the jury's inability to consider mitigating evidence rendered his sentence unreliable. Settled case law, which defendant's briefing largely ignores, is to the contrary.

The failure to present mitigating evidence at the penalty phase of a capital murder trial "does not, in and of itself, render a judgment of death constitutionally unreliable." (*People v. Snow* (2003) 30 Cal.4th 43, 112; *Lang, supra*, 49 Cal.3d at p. 1030; *Bloom, supra*, 48 Cal.3d at p. 1228.) "Rather, the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous

---

and testimony from Terflinger and Hayes would harm the jury's view of any other mitigation evidence he might present. Defendant said he wanted to call Terflinger and Hayes because "they're not family members." He did not "care about putting them through the process of the penalty phase" because he believed "that they could have offered evidence as far as . . . knowing me in prison, what my experiences would have been, and what might have led up to most of the circumstances that the District Attorney has brought out in the penalty phase."

standards does not violate the Eighth Amendment reliability requirements." (*Bloom*, at p. 1228.)

Our cases have also held that a defendant is not deprived of his Sixth Amendment right to counsel by "counsel's acquiescence in the defendant's *own* decision that no defense shall be presented on his behalf." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 925, italics added (*Amezcua and Flores*).) "To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client." (*Lang*, *supra*, 49 Cal.3d at p. 1031.)[14]

As the record quoted above demonstrates, defendant was thoroughly advised of his right to present mitigating evidence. The court questioned defendant directly twice, using "the same kind of care that is required when ensuring that the waiver of any substantial right is personally and properly made." (*Amezcua and Flores*, *supra*, 6 Cal.5th at p. 926.) The court explored whether defendant had discussed specific mitigating evidence with counsel. It confirmed that defendant understood he could be sentenced to death as a consequence of his refusal to

---

[14] Because defendant does not contend the absence of a penalty phase defense deprived him of the effective assistance of counsel, we need not decide whether such decisions about penalty phase evidence are among the "objective[s] of the defense" over which a represented defendant retains control, for purposes of the Sixth Amendment. (*McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500, 1508] (*McCoy*).)

present mitigating evidence. The court even asked whether there was anything it could do to change defendant's mind.[15]

In his reply brief, defendant attempts to argue that he *did* want to present mitigating evidence, but his lawyer unreasonably refused to call the two witnesses he wanted to testify.[16] Defendant does not attempt to describe with any particularity what mitigating evidence Terflinger and Hayes would have presented. He initially told the court their testimony would respond to a suggestion that his gang affiliation indicated future dangerousness, but because the prosecutor did not present such evidence the need for this anticipated rebuttal did not arise. Although defendant later suggested the witnesses could have presented "a different side" of his prison experiences, his attorney strongly believed that their testimony would be harmful to the defense.

Defendant had no right to control *how* his lawyer would present a defense if he chose one because "[t]rial management is the lawyer's province." (*McCoy*, *supra*, 584 U.S. at p. __ [138

---

[15] Defendant suggests we should ignore the second colloquy because it came after the parties had rested. In raising the matter again at this stage, it is clear the court wanted to ensure an adequate record and confirm that defendant was fully advised of his right to present mitigating evidence. The jury had not yet received its penalty phase instructions, and from the court's remarks it is apparent the court would have reopened the case if defendant changed his mind.

[16] Despite defendant's present assertion that he had a "clear conflict" with his attorney, we note that he did not pursue a motion under *People v. Marsden* (1970) 2 Cal.3d 118. He did not object when counsel informed the court that "we have a good relationship," nor does he claim the denial of his *Faretta* motion was error.

S.Ct. at p. 1508].)  Counsel properly has the prerogative to control "choices affecting conduct of the trial, including the objections to make, *the witnesses to call*, and the arguments to advance." (*Gonzalez v. United States* (2008) 553 U.S. 242, 249, italics added; see *McCoy*, at p. __ [138 S.Ct at p. 1508].)  "When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal.4th 312, 376; see *In re Barnett* (2003) 31 Cal.4th 466, 472.)

Defendant's attorney was not required to present testimony from gang members Terflinger and Hayes simply because defendant wanted these witnesses to appear.  Counsel reasonably believed the witnesses would not help the defense.  Guilt phase evidence was offered on defendant's purported association with the Aryan Brotherhood and the role it may have played in his offenses.  However, having heard that evidence, the jury rejected all gang enhancement allegations.  If defendant had called two known gang members to testify on his behalf, the jury might well have second guessed its decision, undermining the credibility of the defense.  Moreover, the jury received evidence in the guilt phase of a letter in which defendant said he was trying to bring these same two men to court.  Witnesses familiar with the Aryan Brotherhood testified that individuals associated with the gang frequently sought to call other gang members as witnesses because trips away from prison gave members an opportunity to conduct illicit gang business.  Indeed, the prosecution presented evidence indicating that Terflinger, in particular, had been trying to arrange a trip to court that fall.  Defense counsel's refusal to call them did not render the death verdict unreliable.

2. *Delay in Providing Habeas Counsel*

In *People v. Williams* (2013) 56 Cal.4th 165, 202, we rejected as speculative a capital defendant's claim that the state would "likely" fail to provide him with habeas corpus counsel in a timely manner, in violation of numerous constitutional provisions. Defendant makes a similar claim here, arguing he has been on death row for nearly 20 years yet is still awaiting habeas counsel. He contends California's delay in this regard violates his rights to counsel, reliable proceedings, and other elements of due process. Although more definite in its articulation, defendant's challenge is no more meritorious than the one we rejected in *Williams*. Defendant filed a habeas corpus petition in propria persona but withdrew it a week after his appellate counsel filed the opening brief in this appeal. He has presented us with no reason to doubt that counsel will ultimately be appointed to represent his interests in collateral proceedings. Accordingly, his arguments here are speculative.

Moreover, defendant's claim is not the sort we have considered cognizable on direct appeal because it " 'does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal.' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 106.) "On direct appeal, defendant is restricted to claims 'bear[ing] on the validity of the death sentence itself.' " (*Ibid*.; see *People v. Charles* (2015) 61 Cal.4th 308, 336 [challenge to state's execution method not cognizable on appeal]; *People v. Hinton* (2006) 37 Cal.4th 839, 919 [claim of error relating to sealing of attorney's billing records not cognizable on appeal].) Defendant's claim is premature and provides no basis for disturbing the judgment.

### 3. *Delay in Death Penalty Review*

Defendant argues the delay in California's administration of the death penalty constitutes cruel and unusual punishment under the Eighth Amendment. We have consistently rejected this claim, explaining that "the automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect [citations], because it assures careful review of the defendant's conviction and sentence [citation]." (*Anderson, supra,* 25 Cal.4th at p. 606.)

We also recently considered the related claim under *Jones v. Chappell* (C.D.Cal. 2014) 31 F.Supp.3d 1050, reversed by *Jones v. Davis* (9th Cir. 2015) 806 F.3d 538, that systematic delays render California's capital punishment scheme arbitrary and capricious in violation of the Eighth Amendment. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1368–1375.) We found no support for the claim. Differences relating to when defendants complete the judicial review process "are not necessarily attributable to arbitrariness . . . , but may instead represent the legitimate variances present in each individual case," including the nature of the facts, length of the record, complexity and number of issues raised, quality of the briefing, and other matters. (*Id.* at p. 1374.) Moreover, we observed, there is no "randomness or a lack of rationality" in a system of judicial review that affords each case the amount of time needed for this court's careful examination of each claim based on its specific factual context. (*Id.* at p. 1375.)

Defendant's briefing offers no basis to reexamine these conclusions. (See *People v. Rhoades* (2019) 8 Cal.5th 393, 453–454 (*Rhoades*); *Winbush, supra,* 2 Cal.5th at p. 488; *People v. Clark* (2016) 63 Cal.4th 522, 645.)

4. *Challenges to Death Penalty Statute*

Defendant raises a number of challenges to the constitutionality of California's death penalty statute. He acknowledges that we have previously rejected all of these claims but presents them again to urge reconsideration and preserve the issues for federal review. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303–304.) We adhere to our settled precedents, which hold:

The class of offenders eligible for the death penalty under section 190.2 is not impermissibly broad. (*People v. Potts* (2019) 6 Cal.5th 1012, 1060 (*Potts*); *People v. Reed* (2018) 4 Cal.5th 989, 1018.) The special circumstances are not so numerous or expansive as to defeat their constitutionally required narrowing function. (*Winbush, supra*, 2 Cal.5th at p. 488.)

Section 190.3, factor (a), which permits aggravation based on the circumstances of the crime, does not result in arbitrary and capricious imposition of the death penalty. (*Rhoades, supra*, 8 Cal.5th at p. 455; *People v. Capers* (2019) 7 Cal.5th 989, 1013 (*Capers*).)

The jury's use of unadjudicated criminal conduct in aggravation under section 190.3, factor (b) does not violate due process or result in cruel and unusual punishment. (*People v. Hoyt* (2020) 8 Cal.5th 892, 954 (*Hoyt*); *Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 469.)

As we have often explained, the jury's penalty choice is a normative decision, not a factual one. (*Beck and Cruz, supra*, 8 Cal.5th at p. 670.) For this reason, California's death penalty scheme does not violate the federal Constitution for failing to require written findings (*People v. Molano* (2019) 7 Cal.5th 620, 678 (*Molano*)); unanimous findings as to the existence of

aggravating factors or unadjudicated criminal activity (*Capers*, *supra*, 7 Cal.5th at p. 1013); or findings beyond a reasonable doubt as to the existence of aggravating factors (other than section 190.3, factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Fayed* (2020) 9 Cal.5th 147, 213 (*Fayed*); *People v. Krebs* (2019) 8 Cal.5th 265, 350 (*Krebs*)). The high court's decisions in *Apprendi, supra*, 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92 do not alter these conclusions. (*Rhoades, supra*, 8 Cal.5th at p. 455; *Capers*, at pp. 1013–1014.)

Defendant challenges two aspects of the jury instructions concerning mitigating evidence. The predicate for these claims fails because defendant instructed his counsel to present no mitigating evidence in the penalty phase. In any event, we have held the words "extreme" and "substantial" in CALJIC No. 8.85 do not unduly constrain the jury's consideration of mitigating circumstances. (*Molano, supra*, 7 Cal.5th at p. 678; *People v. Rices* (2017) 4 Cal.5th 49, 94.) The court was not constitutionally required to instruct that certain factors were relevant only for mitigation. (*Krebs, supra*, 8 Cal.5th at p. 351; *Potts, supra*, 6 Cal.5th at p. 1061.)

The federal Constitution does not require intercase proportionality review. (*Hoyt, supra*, 8 Cal.5th at p. 955; *Rhoades, supra*, 8 Cal.5th at pp. 455–456.) Nor does the death penalty law violate equal protection because it provides different procedures for capital and noncapital defendants. (*Fayed, supra*, 9 Cal.5th at p. 214; *Rhoades*, at p. 456.) California's capital sentencing scheme does not violate international norms or the Eighth Amendment. (*Beck and Cruz, supra*, 8 Cal.5th at p. 671; *Molano, supra*, 7 Cal.5th at p. 679.)

Finally, "considering the arguments in combination, and viewing the death penalty law as a whole, it is not constitutionally defective. Defendant's challenges to California's death penalty scheme 'are no more persuasive when considered together,' than when considered separately. [Citation.] 'California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 426.)

## C. *Cumulative Error*

Defendant asserts that cumulative prejudice resulting from errors in the guilt and penalty phases requires reversal of the judgment. Although the court committed statutory error by allowing defendant to be absent from trial without a written waiver (see § 977, subd. (b)(1); *Wall*, *supra*, 3 Cal.5th at p. 1060), we have identified no additional errors, nor any ruling that caused defendant undue prejudice. Accordingly, the claim fails. (See *People v. Gonzalez* (2021) 12 Cal.5th 367, 417.)

## III. DISPOSITION

The judgment is affirmed.


**CORRIGAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

PEOPLE v. POORE

S104665


Concurring Opinion by Justice Liu


In a line of cases tracing back to *People v. Lang* (1989) 49 Cal.3d 991, this court has held that counsel to a capital defendant does not provide constitutionally ineffective assistance under the Sixth Amendment to the United States Constitution by acquiescing to the defendant's desire not to present evidence in mitigation at the penalty phase. (*Lang*, at p. 1031.) We have said that a defendant may "request not to present certain evidence for nontactical reasons," and counsel's agreement to that request is not deficient performance. (*Ibid.*; see, e.g., *People v. Brown* (2014) 59 Cal.4th 86, 112 ["[I]f a competent defendant decides for nontactical reasons to present no mitigating evidence, he cannot later label counsel ineffective for honoring the defendant's own wishes."].)

This rule appears in some tension with the high court's recent decision in *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500] (*McCoy*). *McCoy* held that a defendant's Sixth Amendment right to the assistance of counsel is violated when defense counsel concedes guilt over the client's objection. (*McCoy*, at p. __ [138 S.Ct. at p. 1509].) The high court explained that decisions about the objectives of a criminal defense are "reserved for the client." (*Id.* at p. __ [138 S.Ct. at p. 1508].) This includes the decision "that the objective of the defense is to assert innocence." (*Ibid.*) In *McCoy*'s framing, "the objective of the defense" appears to mean the verdict the defendant seeks to obtain — guilt of the charged offense, guilt of

1

a lesser offense, or innocence. By contrast, "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' " (*Ibid.*)

It is not obvious that decisions about the particular evidence to present at the penalty phase — or whether to present mitigation evidence at all — should be considered part of "the objective of the defense" that remains within a represented defendant's control under the division of roles articulated in *McCoy*. (*McCoy*, *supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1508].) Rather, those decisions would seem to be aspects of "[t]rial management" reserved to counsel: They are "strategic choices about how best to *achieve* a client's objectives" as opposed to "choices about what the client's objectives in fact *are*." (*Ibid.*) Following *McCoy*, when a capital defendant at the penalty phase has decided to seek a verdict of life without the possibility of parole rather than death, counsel may be empowered to decide what evidence to bring forward to advance that objective, and ceding that authority to the defendant may constitute ineffective assistance.

In this case, defendant Christopher Eric Poore has argued that his counsel's acquiescence in his desire not to present certain mitigating evidence rendered his death verdict unreliable for purposes of the Eighth Amendment, but he has not argued that it was ineffective assistance of counsel under the Sixth Amendment. The court's opinion therefore does not reach that Sixth Amendment question. (Maj. opn., *ante*, at p. 52, fn. 14.) Whether *McCoy* affects our precedent on the right of a capital defendant to control counsel's presentation of mitigating evidence awaits assessment by our court in a case in

which the issue is presented.  With that understanding, I join the court's opinion.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Poore

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S104665
**Date Filed:**  June 27, 2022

_____

**Court:**  Superior
**County:**  Riverside
**Judge:**  Randall D. White

_____

**Counsel:**

R. Clayton Seaman, Jr., and Patricia A. Scott, under appointments by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Ronald S. Matthias, Assistant Attorney General, Theodore M. Cropley, Anthony Da Silva and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patricia A. Scott
Attorney At Law
P.O. Box 11056
Prescott, AZ 86304
(928) 233-5415

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9211