Filed 2/9/26  P. v. Jones CA2/4
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B320040 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA037935) |
| v. | |
| MARCUS JONES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Reversed and remanded with directions.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

In 1996, when they were 15 years old, appellant Marcus Jones and his cousin, Melvin Jones (Melvin), robbed a small store. Melvin shot and killed the owner of the store during the robbery. Appellant was convicted of robbery and murder and sentenced to an aggregate term of 26 years to life in state prison.

In 2019, appellant sought resentencing pursuant to Penal Code section 1170.95 (now section 1172.6).[1] After issuing an order to show cause and holding an evidentiary hearing at the direction of *People v. Jones* (Apr. 22, 2021, No. B304692) [nonpub. opn.]), the trial court found appellant ineligible for relief as a major participant in the robbery who acted with reckless indifference to human life. This court affirmed that ruling. (See *People v. Jones* (July 20, 2023, B320040) [nonpub. opn.].)

The Supreme Court granted appellant's petition for review and subsequently transferred the matter back to this court "with directions to vacate its decision and reconsider the cause in light of *People v. Emanuel* (2025) 17 Cal.5th 867 [(*Emanuel*)]," which clarified the reckless indifference standard and its application in the section 1172.6 context. In supplemental briefing (see Cal. Rules of Court, rule 8.200(b)), appellant argues that *Emanuel* provides further support for his contention that the trial court erred by finding that he acted with reckless indifference to human life. We agree and reverse.

---

[1]     Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. We hereafter refer to the statute as section 1172.6. All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

The parties stipulated to the admission of the following evidence at the section 1172.6, subdivision (d)(3) evidentiary hearing: (1) a transcript of percipient witness Antonio Ochoa's trial testimony; (2) an investigatory police report from the Inglewood Police Department (police report); (3) a transcript of a surreptitiously recorded conversation between appellant and Melvin following their arrest shortly after the crime; (4) a psychiatric report prepared in 1996 to determine appellant's fitness for juvenile court treatment (psychiatric report); (5) a transcript of appellant's trial testimony; (6) a probation report prepared when appellant was sentenced; (7) the Supreme Court's opinion in *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667; and (8) the opinion in appellant's direct appeal, *People v. Jones* (Sept. 25, 2001, B143098) [nonpub. opn.].

While there is some dispute about certain facts, namely whether appellant fully entered the store or grabbed the money after victim Won Hee Lee was shot, the parties generally agree on the facts.

## I.  Incident, Escape, and Apprehension

Around 7:45 p.m. on May 23, 1996, victim Lee was inside his small store, the Park Avenue Market in Inglewood. His employee, Ochoa, was sweeping outside the only entry into the store. Ochoa and other eyewitnesses saw two teenage Black males, later identified as appellant and Melvin, emerge from a "small alcove" and walk toward and enter the store. Although there was evidence suggesting appellant had the gun at that time, it is undisputed for purposes of this appeal that Melvin procured the gun, wielded it during the robbery, and fired the fatal shot at Lee.

3

Ochoa looked inside the store and saw Melvin pointing the gun at Lee with an outstretched arm. Ochoa heard one of the teens say, "Okay. This is –," and then heard a gunshot. About 30 seconds later, Ochoa saw appellant and Melvin walk out of the store, cross the street, and run away together.

Ochoa saw a police officer nearby and yelled that his boss had been shot. He then got into his car and followed appellant and Melvin as they fled. After he saw them jump a fence surrounding an elementary school, Ochoa drove around the school and saw them walking into "some apartments." Police officers who had also pursued appellant and Melvin arrived and detained them at the apartments. Police later recovered "numerous pieces of evidence" between the store and the apartments, including a dollar bill and green button on the sidewalk, a green scarf and a "blue rubber mask-like object" in a nearby front yard, a gray sweatshirt by the school, and a revolver lying in the front yard of the home next to the apartments. They recovered $31 from appellant's pants pockets when he was booked.

Lee was pronounced dead at the hospital shortly after the incident. An autopsy revealed that the cause of death was a single gunshot wound to the head. The coroner observed "stifling [*sic*]" and black powder near Lee's mouth and concluded he was shot at close range "of less than eighteen inches and probably as close as six inches."

## II.   Surreptitiously Recorded Statements

After arresting appellant and Melvin, the police placed them in the back of a police cruiser that had a tape recorder running. Appellant and Melvin proceeded to have an expletive-laden conversation about the incident.

Appellant repeatedly told Melvin that he should not have "blasted" or "busted" Lee in the face. Appellant further said, many times in many ways, that Melvin had "fucked up." At least twice, appellant told Melvin that he, appellant, should have been the one to hold the gun. Appellant remarked that after Melvin shot Lee, "We can't do shit but grab money, man, we fuckin' just sweatin' like. . . ." Appellant also made an additional comment suggesting he and Melvin became intoxicated for the purpose of committing the robbery: "I didn't want to do that shit, man, that's why we got faded out like a mother fucker."

Appellant suggested several times that he and Melvin would not have been caught if Melvin had not lost his apartment keys, and said they should "break" or "run" from the police car, "first chance we get." He also expressed concern that he and Melvin would get life in prison or "the electric chair." At one point, he added, "I bet we can't get off on a fuckin' first offense, n*****"; he later reiterated, "If you wouldn't have shot him in the face it would have been our first offense." He also stated, "You should have never did this shit on me. If you wouldn't have shot that n***** in the face, we'd be out clean. Cause I would have dumped it on somebody else. But we about to go to jail, n*****. You shot that n***** in the face."

III.   **Appellant's Post-Arrest Statements**

After he was advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, appellant told officers that he and Melvin went to Melvin's apartment after school on the day of the incident. Around 5:00 p.m., they went to a liquor store and got someone to buy them a bottle of vodka, which they shared. They then walked around the area of the Park Avenue Market, which Melvin had been talking about robbing since that morning,

5

"because they could get away with it here." Appellant told Melvin "he wasn't ready to do this" and tried to persuade Melvin not to rob the store. He also said, however, that he did not want Melvin to go in alone "because he didn't want him to get shot."

The plan was to go into the store, tell everyone in there to get down on the floor, "rush the cash register," get the money, and leave. Appellant "figured Melvin wouldn't rob a liquor store without" a gun, and, indeed, Melvin withdrew a revolver from his sock right before they entered the store. Appellant did not know where Melvin got the gun, and he stated that "[t]he plan wasn't to shoot anyone." He also told the officers, "It never works like you plan."

Before they entered the store, appellant "put a black facial thing around his head" and donned one black glove. Appellant thought Melvin "might have put a blue beanie or something on his head." Melvin then entered the store, and appellant followed, standing "between the doorway and the front counter." Appellant "'heard the blam' and saw the victim fall back." He thought Melvin "reached over the counter and took the money out of the register." Melvin gave the money to appellant, who had about $17 before entering the store. Melvin and appellant then left the store and ran to Melvin's house, hopping the fence of a nearby school on the way.

## IV. Psychiatric Report and Supreme Court Opinion

In July 1996, psychiatrist Jack Rothberg, M.D., Ph.D., evaluated appellant to assess his suitability to be tried in juvenile court.

According to Rothberg's report, appellant stated that Melvin wanted to rob the store for cash. Appellant was reluctant to participate, "but was concerned that Melvin might get hurt,

6

and so he came along, in essence to protect him." Appellant "insist[ed] that he does not use drugs," but admitted that he and Melvin consumed alcohol before the incident. Appellant said he had previously seen Melvin with a gun, but also said neither he nor Melvin had experience using a gun; the report noted, "[w]hen loading it they had apparently cocked the trigger, but had no idea how to uncock it."

When appellant and Melvin entered the store, it "seemed only a matter of seconds before [appellant] heard 'pow.'" Appellant maintained that Melvin did not intend to shoot anyone, and that the gun "simply discharged while he was pointing it at the store owner." The report continued, "Marcus explains that after that he 'did something stupid' emptying the register and running out." Appellant said he was "'not in my right mind,' apparently because he had some alcohol to drink." Rothberg noted that appellant "expressed considerable remorse about the crime, both with respect to the victim and the victim's family."

Rothberg concluded appellant would be an appropriate candidate for juvenile court. The juvenile court agreed, but the Supreme Court ulitmately determined appellant should be tried as an adult. (See *People v. Superior Court (Jones), supra,* 18 Cal.4th 667.) In its opinion, the Supreme Court made two statements appellant cites as facts in his briefing: (1) while in the police car, Melvin said he grabbed the money[2] (see *People v.*

---

[2] The transcript of the surreptitious recording admitted at the evidentiary hearing does not contain that statement. It quotes Melvin as saying, "I know I did, too, then I wouldn't have shot, man. I was like fucked up. I just grabbed the [unintelligible.]." The recording itself was not admitted at the hearing and is not part of the appellate record.

*Superior Court (Jones), supra*, 18 Cal.4th at p. 673); and (2) "The minors waited in an alcove near the store for customers to leave." (*Id.* at p. 672.)

After the Supreme Court issued its opinion, appellant and Melvin were tried together in criminal court. The jury convicted Melvin of first degree murder and robbery, but the court declared a mistrial as to appellant. Appellant was later retried separately, in 2000. (*People v. Jones* (Sept. 25, 2001, No. B143098) [nonpub. opn.].)

## V.    Appellant's Trial Testimony

At his retrial, appellant "relied on an intoxication defense" and testified on his own behalf. (*People v. Jones* (Sept. 25, 2001, No. B143098) [nonpub. opn.].) He testified that he and Melvin were both 15 years old at the time of the shooting; appellant was one month older than Melvin and therefore was "over-protective" of him. Melvin was like a brother to him; they spent the night at each other's homes, went to the same school and church, and played on the same basketball team.

On May 23, 1996, while they were at school, Melvin told appellant he wanted to "do something to get some money," which appellant understood to mean "[r]obbery, stealing something, something illegal." Melvin had made similar comments "in the past," "like a little here, a little there," but appellant "shoved it off" because he had never known Melvin to follow through.

After school, appellant and Melvin went to a friend's house to play video games. They smoked marijuana and shared a pint of vodka with the friend. On the way home from the friend's house, appellant and Melvin stopped at the liquor store and got someone to buy them another pint of vodka. Appellant and Melvin shared the bottle as they walked toward Melvin's house.

8

On the way, they stopped at a nearby elementary school where they often hung out. Appellant felt very drunk by that point; he vomited twice.

While appellant and Melvin were sitting outside the elementary school, Melvin pulled a gun out of his sock and told appellant, "he wanted to rob Mr. Lee's store." Melvin said it would be "easy": they would "go in there and get the money and get out." Appellant said he did not want to do it, and that it was wrong. He also testified that he was scared of "the whole situation," because he "didn't want to get killed" and "didn't want to go to jail." Melvin used "peer pressure words" and taunted appellant. Appellant steadfastly refused to participate, and Melvin eventually said, "Fuck it. I'm going with or without you." When Melvin got up and started walking away, appellant felt "like that was the last time I was gonna see my cousin, my brother, alive again," because he thought Melvin "was gonna get himself killed." Appellant decided to go with Melvin to prevent him from getting hurt and "[k]eep him from hurting anyone." He continued his efforts to talk Melvin out of the robbery the whole way to the store.

When they arrived, they stopped in an alcove near the store. Melvin put on a mask and handed appellant a glove. Appellant put the glove in his pocket and wrapped his basketball bandana around his face. Appellant did not try to take the gun away from Melvin because he "didn't know if the gun was loaded" and "wasn't about to risk me accidentally getting shot or him accidentally getting shot. Both of us drunk, tussling with a gun. No. No."

Melvin and appellant left the alcove, and Melvin entered the store alone while appellant stood in the doorway to prevent

9

anyone from getting hurt. Melvin ran to the counter and "bark[ed] a couple words" before appellant heard a gunshot. Appellant then saw Melvin reach over the counter toward the cash register. Appellant said, "What the fuck you doing?" and wondered why Melvin was grabbing money when someone had just been shot. From the doorway, appellant reached for Melvin and tried to pull him out of the store. Melvin handed money to appellant, who put it in his pocket before pushing Melvin out the door.

Appellant ran away with Melvin toward the elementary school. As they were running, Melvin asked for appellant's bandana; appellant "snatched it off and gave it to him." Appellant did not know what Melvin did with the bandana or his own ski mask. He and Melvin ran through the schoolyard, hopped some fences, and walked toward Melvin's apartment.

Police arrived shortly thereafter and detained them. In the police car, appellant "express[ed] [his] true feelings" to Melvin, "that I felt like he fucked up our life personally." Appellant said he felt "helpless" at the time, because he had seen someone get shot and "couldn't stop it."

On cross-examination, appellant admitted that he lied to Rothberg about using drugs, though on redirect he said that he thought Rothberg had been referring to hard drugs, not marijuana. Appellant did not recall telling Rothberg that he had previously seen Melvin with a gun. Appellant also said that he told Rothberg that Melvin had cocked the trigger, because "both of us can't cock the trigger." Appellant denied telling Rothberg, "I did something stupid" by emptying the register. On redirect, he explained that he told Rothberg that Melvin emptied the register.

10

Appellant stated that he watched Melvin load the gun while they were sitting at the elementary school, contradicting his earlier testimony that he did not know if the gun was loaded. When pressed by the prosecutor about his understanding of the plan and awareness that Melvin was loading the gun, appellant explained that he was drunk but not "pissy drunk." He further agreed that he "knew at that time that in the course of robbing that store, somebody could get killed."

Appellant said he "wasn't scared of" Melvin and "[d]idn't feel pressure" from Melvin's taunts and use of what he called "the usual peer pressure." Appellant denied ever touching the gun or even "paying attention" to it during the robbery. Because he had "less maturity" at the time of the incident, he never tried to take the gun away from Melvin or yell that he was armed; he thought his mere "presence" in the doorway of the store would help the situation. After the shooting, appellant did not shout for help or check on Lee; he did not "want to see if Mr. Lee was alive" because he had "never seen a dead body before, and I didn't want to see one."

## PROCEDURAL HISTORY

On May 22, 2000, a jury found appellant guilty of first degree murder (§ 187, subd. (a)) and second degree robbery (§ 211). It also found true principal use firearm allegations (§ 12022, subd. (a)(1)). On July 13, 2000, the court sentenced appellant to 25 years to life for the murder conviction, plus one year consecutive for the related firearm enhancement. The court stayed the sentence on the robbery conviction under section 654. This court affirmed appellant's convictions and sentence on direct appeal. (See *People v. Jones* (Sept. 25, 2001, No. B143098) [nonpub. opn.].)

11

On May 15, 2019, appellant, through counsel, filed a petition for resentencing pursuant to section 1172.6. The People filed a response arguing that appellant was ineligible for resentencing because he was a major participant in the crime under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and acted with reckless indifference toward human life under *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The trial court agreed and denied the petition. On appeal, appellant contended the court erred by making factual findings at the prima facie stage of the case. This court agreed and reversed the trial court's order. The opinion remanded the matter with directions to issue an order to show cause and proceed under section 1172.6, subdivision (d). (See *People v. Jones* (Apr. 22, 2021, No. B304692) [nonpub. opn.].)

At the ensuing evidentiary hearing, the parties stipulated to the admission of the evidence summarized above.[3] The matter then proceeded to argument. The People contended that appellant was a major participant who acted with reckless indifference to human life, emphasizing evidence suggesting he took money from the store after Melvin shot Lee and his statements that Melvin should not have had the gun. The People further asserted that various portions of appellant's trial testimony were not credible, including his assertion that he never entered the store during the crime.

---

[3] Both parties offered Ochoa's trial testimony, appellant's trial testimony, and the transcript of the surreptitious recording; appellant offered the rest, including the police report he now claims is inadmissible hearsay. The parties stipulated that Ochoa was legally unavailable to testify at the evidentiary hearing.

12

Appellant responded that the People failed to carry their burden. He emphasized that he was only 15 years old at the time of the crimes and was not the actual killer. Despite repeatedly asserting that "the basic facts of this case are generally agreed upon by both parties," appellant maintained that he never entered the store and that Melvin took the money. Appellant argued that all the *Banks* factors indicated he was not a major participant; he characterized his involvement in the planning and execution of the crime as minimal, and asserted that he intended only to "persuade Melvin out of it" and "keep Melvin from getting killed or hurting anyone." Appellant also argued that all the *Clark* factors indicated that he did not act with reckless indifference to human life. Appellant acknowledged that fleeing the scene without aiding Lee was "not the most admirable course of action he could have taken," but asserted that it did not "tip the scales in favor of him being convicted on murder on this case, and it's not probative of reckless disregard." He also reiterated that neither he nor Melvin had a history of violence, he "thought that his presence during the robbery would minimize" the risk of violence, and the shooting happened moments after Melvin entered the store.

In its oral ruling, the trial court remarked that it was "very important to consider . . . the defendant's age at the time of this incident." It found, however, that the transcript of the post-arrest conversation evinced appellant's "sophistication," "fears . . . for himself," and awareness that Melvin "shot the person in the face." The court also noted that appellant "lament[ed] the fact that he didn't have the gun instead of his younger cousin." The court explained that "[t]hose facts are very important to the court for two reasons: one, they come directly from the defendant

13

himself, the petitioner himself. This is what the petitioner has in his mind immediately after this heinous act; two, it shows that he is not an unsophisticated typical 15 year old. He's talking about the money, . . . he talks about being in the pen for some while. He's very aware of the nature of what happened."

After incorporating by reference "in my findings here all of the factors" the People outlined,[4] the court found that appellant and Melvin planned the incident over a full day, that appellant was present when the gun was being loaded, and that appellant knew that an armed robbery "presents a whole other level of dangerousness to a typical robbery." The court further found that appellant "was immediately interested in the money," that he and Melvin took steps to conceal their identities before the robbery, and that they ran away together afterward rather than rendering aid to Lee.

The court ultimately concluded that "the People have proven beyond a reasonable doubt that the defendant was a major participant, not only in the planning and the execution of this crime, but in the getting away safely afterwards of the crime, and he acted with absolutely reckless disregard for the life of Mr. Lee. Both before when he planned the crime he had no fear about the fact that they were going in with an armed gun, a loaded gun, and afterwards he showed that he was absolutely indifferent to whether or not Mr. Lee lived or died. His only concern at that point was getting away, splitting the money, avoiding a life sentence." It accordingly denied the petition.

---

[4] The court did not clarify whether it intended to incorporate the People's oral argument, written argument, or both. The People asserted in both arguments that appellant entered the store and took the money.

Appellant timely appealed.

## DISCUSSION

### I.    Section 1172.6

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f); accord, § 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)  As amended by SB 1437, section 189 now limits liability under a felony-murder theory to "actual killer[s]" (§ 189, subd. (e)(1)) and those who, "with the intent to kill," aid or abet "the actual killer in the commission of murder in the first degree" (*id.*, subd. (e)(2)).  Individuals who do not fall into those categories can be held liable for murder only if they were "major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2" —the statute defining the felony-murder special circumstance.  (*Id.*, § 189, subd. (e)(3); see *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

Section 1172.6 permits individuals who were convicted of felony murder or murder under a natural and probable consequences theory, but who could not be convicted of murder following SB 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts.  (§ 1172.6, subd. (a).)  Where, as here, the petitioner makes a prima facie case for eligibility, the trial court

15

must issue an order to show cause and hold an evidentiary hearing at which the People have the burden of proving beyond a reasonable doubt "that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

The court "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." ( § 1172.6, subd. (d)(3).) Additionally, both the petitioner and the People "may also offer new or additional evidence to meet their respective burdens." (*Ibid.*) "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*) Resentencing is unavailable if the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life. (*Strong, supra*, 13 Cal.5th at p. 710.) The trial court acts as an independent factfinder and determines whether the prosecution has met its burden. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).)

II.    **Standard of Review**

On appeal from an order denying a section 1172.6 petition after an evidentiary hearing, we review the trial court's factual

16

findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090; *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).) "We '"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."'" (*Clements*, *supra*, 75 Cal.App.5th at p. 298, quoting *People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658; see also *Emanuel*, *supra*, 17 Cal.5th at p. 885.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) We do not reweigh evidence or revisit the trial court's credibility determinations.[5] (*People v. Cody* (2023) 92 Cal.App.5th 87, 112-113.)

---

[5] Appellant's repeated assertions that he did not enter the store and that "[t]he bulk of the evidence actually supports that Melvin took the money" accordingly are not well-taken. Nor are his suggestions that the trial court did not review all the exhibits or appropriately apply the relevant case law because it did not specifically cite them in its remarks. "In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092.) Similarly, "courts need not

## III.  The *Banks* and *Clark* Factors

In *Banks*, *supra*, 61 Cal.4th 788, the Supreme Court set out a nonexhaustive list of considerations relevant to whether a defendant's participation in criminal activities known to carry a grave risk of death is sufficiently significant to render him or her a "major participant" in the crime.  (See *Strong*, *supra*, 13 Cal.5th at p. 705, citing *Banks*, *supra*, 61 Cal.4th at p. 794.)  Those considerations are:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

*Clark*, *supra*, 63 Cal.4th at pp. 618-623, similarly set forth a list of considerations relevant to determining whether a defendant acted with reckless indifference to human life.  The first factor relates to weapons: was the defendant aware that weapons would be used in the felony?  Did the defendant use a weapon?  How many weapons were used in the crime?  (*Clark*, *supra*, 63 Cal.4th at p. 618.)  The court cautioned that "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human

---

cite every case parties mention."  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 585.)

life." (*Ibid.*; see also *id.* at p. 617, fn. 74 ["A robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun is what we meant by 'a garden-variety armed robbery' in *Banks, supra*, 61 Cal.4th at p. 802."].) The second factor is the defendant's physical proximity to the murder and the events leading up to it, and the opportunities that proximity afforded to restrain the crime or aid the victim. (*Clark, supra*, at p. 619.) The third factor is the duration of the felony, particularly the duration of the interaction between victims and perpetrators; more prolonged incidents provide "'a greater window of opportunity for violence.'" (*Id.* at pp. 620-621.) The fourth factor is the defendant's awareness of his or her codefendants' propensity for violence or likelihood of killing a victim. (*Id.* at p. 621.) The final factor is the defendant's efforts to minimize the risk of violence during the felony, though the court cautioned that "some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life." (*Id.* at pp. 621-622.) In cases where a defendant was a youth at the time of the crime, his or her age may also be relevant to determining whether he or she acted with reckless indifference. (See *Emanuel, supra*, 17 Cal.5th at p. 885 fn. 6; *In re Moore* (2021) 68 Cal.App.5th 434, 453-454 (*Moore*); *Ramirez, supra*, 71 Cal.App.5th at p. 987.)

No single *Banks* or *Clark* factor is determinative. (*Clark, supra*, 63 Cal.4th at pp. 618, 621–623.) "Lower courts should take care to consider the presence or absence relating to each relevant factor on its own merits before considering the evidence in its totality." (*Emanuel, supra*, 17 Cal.5th at p. 888.)

## IV. Analysis

### A. Major Participant (*Banks*)

We apply the *Banks* factors and consider the totality of the circumstances. We conclude substantial evidence supports a finding that appellant was a major participant in the robbery.

With regard to the first factor, appellant's role in planning, appellant asserts that the only evidence "came from appellant's statements" that Melvin was the mastermind and appellant's only role was, essentially, trying to talk Melvin out of it. "Thus, this factor does not support that appellant had a role in planning the robbery." We disagree. Appellant's testimony, originally offered in support of his defense at trial, indeed minimizes his planning role. Other evidence in the record suggests he was more actively involved, however. The Supreme Court opinion regarding suitability for juvenile adjudication—on which appellant relies to support factual assertions—indicates that appellant and Melvin frequently talked about "jacking" someone for money, engaged in an ongoing "discussion" about the robbery throughout the day, and took the preparatory step of acquiring facial coverings from the lost-and-found at their school. (*People v. Superior Court (Jones)*, *supra*, 18 Cal.4th at pp. 672, 676.) Even setting aside those statements, the psychiatric report suggests appellant and Melvin jointly loaded and cocked the gun. More telling are appellant's surreptitiously recorded statements that he got intoxicated to prepare himself for the robbery, and that Melvin should have given him the gun, from which it can reasonably be inferred that he was more extensively involved in planning than his self-serving testimony indicated.

As to the second factor, his role in supplying or using lethal weapons, appellant contends he was uninvolved in either aspect.

We agree.  There is no dispute that Melvin alone procured the gun and fired at Lee.  At most, appellant was aware of the gun and knew it was loaded.

The third factor is appellant's awareness of particular dangers posed by the crime, weapons used, or past experience or conduct of other participants.  Appellant acknowledges that he "knew that an armed robbery was illegal and dangerous," but asserts that neither he nor Melvin had prior experience with crime, violence, or guns, and appellant "had no reason to even suspect that Melvin might actually fire the gun."  Respondent Attorney General points out that the psychiatric report states that appellant previously had seen Melvin with a gun.  Respondent also suggests, and we agree, that appellant's recorded comments that he should have been the one to hold the gun evince some awareness that Melvin posed a danger with the weapon,[6] as does appellant's testimony that he did not try to disarm Melvin for fear of getting shot himself.  Respondent's suggestion that Melvin's possible status as a gang member rendered him more dangerous is less well-taken; gang membership alone does not demonstrate a propensity to commit lethal violence.  (See *Banks*, *supra*, 61 Cal.4th at pp. 810-811; *In*

---

[6]     Appellant maintains that the People and respondent "have taken appellant's comment out of context," because he "said this right after asking Melvin what he did with the gun," such that the "implication is that appellant was referring to the time during which they were fleeing."  Even if we were to accept this inference, which the standard of review precludes here, we note that appellant omits any mention of the other time he said "I know you shouldn't have fuckin' held the gun, man.  I know you fuckin' shouldn't have," which is nowhere proximate to any statements about fleeing.

21

*re Ramirez* (2019) 32 Cal.App.5th 384, 405.)  Nevertheless, the trial court reasonably could conclude that appellant recognized that Melvin's possession of the gun during the robbery increased the risks associated with the crime.

The fourth factor considers whether appellant was present at the scene and in a position to facilitate or prevent the murder, and whether his actions or inaction played a particular role in the death.  Appellant concedes he was at the scene, but asserts the shooting happened so quickly that he had no realistic opportunity to prevent it.  He also emphasizes Melvin's recorded comments suggesting the shooting was unintended.  Respondent argues that appellant was "actively involved in the execution of the robbery, including the wearing of masks," though it is unclear what relevance appellant's attire had to his presence or ability to prevent Melvin from shooting.  Ultimately, this factor is mixed: appellant was at the scene and physically proximate to Melvin in the small store, but there is little evidence appellant could have timely intervened, as the shooting occurred before Melvin and appellant even finished informing Lee he was being robbed.

The final factor is what appellant did after lethal force was used.  Appellant contends that he simply fled the scene with Melvin; he disputes the People's assertion that he disposed of evidence.  He also maintains that the "bulk of the evidence" shows that Melvin was the one who took the money after Lee was shot.  As discussed above, we do not weigh the evidence on appeal.  Instead, we consider whether substantial evidence supports the court's adopted findings that appellant took the money after Lee was shot and disposed of evidence.  We conclude it does.  Appellant's self-serving trial testimony indicated that Melvin took the money, but the money was found in appellant's

22

pocket, not Melvin's, when they were arrested. The psychiatric report also noted that appellant said he "'did something stupid' emptying the register and running out," and appellant remarked during the recorded conversation that after the shooting, "We can't do shit but grab money, man . . . ." A reasonable factfinder could conclude from this evidence that appellant took the money after Lee was shot, rather than rendering aid or even simply fleeing. There was also evidence that various incriminating articles were found along appellant and Melvin's escape route. We thus agree with respondent that "[t]his factor does not help appellant."

In sum, the record contains substantial evidence supporting the trial court's conclusion that appellant was a major participant in the robbery.

## B.    Reckless Indifference (*Clark*)

There is significant overlap between being a major participant and acting with reckless indifference to human life, and "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at pp. 614-615.) However, that does not necessarily mean that every major participant in a crime acts with reckless indifference to human life. Indeed, we find a disconnect here.

As the Supreme Court recently reiterated in *Emanuel*, *supra*, 17 Cal.5th at p. 884, participation in a "'variety armed robbery'" is "insufficient without more to establish reckless indifference." The defendant must not merely be aware of the foreseeable risk of death inherent in any violent felony; he or she must knowingly create a grave risk of death to demonstrate reckless indifference to human life. (*Ibid.*) The defendant's

23

actions before and during the crime are important but not determinative; the key inquiry is "what his actions reveal about his mental state." (*Id.* at p. 891.) We keep this guidance in mind as we consider the *Clark* factors.

The first *Clark* factor overlaps with the second *Banks* factor: what did the defendant know about the weapons used in the felony? Did the defendant use a weapon? How many weapons were used in the crime? (*Clark, supra*, 63 Cal.4th at p. 618.) Appellant did not use the sole weapon present during the crime. His knowledge that Melvin had a weapon and therefore posed a risk of death is not sufficient to establish reckless indifference. (See *Clark, supra*, 63 Cal.4th at p. 618.) The trial court emphasized that appellant was present when the gun was loaded, as well as his understanding that taking a loaded gun to the crime scene "greatly increases the dangerousness of that." However, this does not elevate this robbery beyond the so-called "garden variety armed robbery," even if appellant was involved in loading the gun. Appellant asserts that he "did not have any reason to believe Melvin would fire the gun," and, indeed, there is no evidence that Melvin had a previous record of gun use or a propensity for violence. Although appellant stated multiple times that he should have been the one to hold the gun, there is no evidence that he instructed or encouraged Melvin to use lethal force. (See *Ramirez, supra*, 71 Cal.App.5th at p. 988.) In short, this factor predominantly favors appellant.[7]

---

[7] In its supplemental briefing, respondent points out that the defendant in *Emanuel, supra*, 17 Cal.5th at p. 867, in which the Supreme Court found insufficient evidence of reckless indifference, did not use a gun and had no knowledge one would

The second *Clark* factor, the defendant's physical proximity to the murder and the events leading up to it, and the opportunities that proximity afforded to restrain the crime or aid the victim, is similar to the fourth *Banks* factor. This factor is particularly significant where the "the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark*, *supra*, 63 Cal.4th at p. 619.) "But where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Emanuel*, *supra*, 17 Cal.5th at p. 892.)

As already discussed, appellant was present throughout the robbery and murder, and fled with Melvin afterward. Despite his contentions that he did not enter the store or take money from the register, substantial evidence supports the conclusion that appellant did so and was an active participant in the robbery. However, as appellant argues, this factor ultimately weighs against a finding of reckless indifference because the shooting happened quickly and unexpectedly, and there is no evidence that appellant had a meaningful opportunity to stop it. (See, e.g., *In re Scoggins* (2020) 9 Cal.5th 667, 679 (*Scoggins*) ["although Scoggins was in close contact with his accomplices before the shooting, he lacked control over their actions once they arrived on the crime scene, especially given how quickly the shooting

---

be present during the crime. This is but one factor to consider in the "'fact-intensive, individualized inquiry'" into reckless indifference. (*Emanuel*, *supra*, 17 Cal.5th at p. 883.)

occurred"]; *Moore, supra,* 68 Cal.App.5th at p. 452 [the "short duration of the robbery and the sudden and unprovoked nature of the shooting reinforce" the conclusion that a defendant present in a car near the robbery did not act with reckless indifference]; *Ramirez, supra,* 71 Cal.App.5th at p. 989 ["[t]he attempted carjacking was executed quickly, providing Ramirez no realistic opportunity to intervene before Rios opened fire"].)

A meaningful opportunity to intercede "requires some awareness of the risk of impending lethal violence and time to react." (*Emanuel, supra,* 17 Cal.5th at p. 892.) As noted above, Melvin fired the gun before the statement, "Okay. This is –" was complete. There were no express threats to shoot, countdowns, or warning shots. (See *ibid.* [distinguishing *In re Loza* (2017) 10 Cal.App.5th 38, 53 and *In re McDowell* (2020) 55 Cal.App.5th 999, in which "the shooters . . . made their intentions clear, affording each defendant 'the time to observe and react before the murder'"].) "Without forewarning that [Melvin] would deploy lethal violence, [appellant's] inaction is less probative." (*Emanuel, supra,* at p. 892.)

Appellant's conduct after the use of lethal force "may be reflective of his . . . mental state during the offense." (*Emanuel, supra,* 17 Cal.5th at p. 893.) Respondent emphasizes that appellant "made no attempt to call 911 or otherwise assist the victim," and instead grabbed a few dollars and fled the scene. It contends this behavior "is not that of a person surprised by the shooting, but rather someone with a one-track mind to make sure the robbery was successful, regardless of whether someone might die, or was dying, in the process." Yet, as explained in *Emanuel,* "[h]owever contemptable [*sic*] we may find a defendant's conduct following a killing, the governing standard is not satisfied by

26

evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference to the grave risk that someone *could be* killed." (*Id.* at p. 895 (emphases in original).) "[E]ven if a defendant is unconcerned that the planned felony resulted in a death, there must also be evidence that the defendant was aware of and willingly involved in the violent manner in which the felony was committed and consciously disregarded the significant risk of death that his or her actions created." (*Ibid.*) Here, there is no evidence that appellant planned or intended anything other than a garden-variety armed robbery. He and Melvin planned to enter the store, tell everyone to get down on the floor, get money from the cash register, and leave. "The plan wasn't to shoot anyone."

Moreover, as in *Emanuel, supra*, 17 Cal.5th at p. 894, appellant "took no actions after the shooting that might prevent or interfere with [Lee's] ability to obtain or chances of receiving aid." The shooting occurred in an open business. As in *Emanuel*, "numerous witnesses were nearby and heard the commotion," and law enforcement was summoned immediately. (*Ibid.*) The presence of other persons made it more likely that Lee would receive aid, and also could have motivated appellant "to flee the scene as quickly as possible to avoid arrest, whether or not he understood the extent of [Lee's] injuries." (*Ibid.*) This factor thus generally favors appellant.

The third *Clark* factor, duration of the crime, also favors appellant. "[C]rimes of longer duration present greater risk of violence and therefore evince more reckless indifference." (*People v. Saibu* (2022) 81 Cal.App.5th 709, 740.) The robbery here was brief; respondent concedes this factor "was at best neutral as the

27

shot was fired not long after the two entered the store." We agree with appellant that the short duration of the crime suggests a lack of reckless indifference. "There was no prolonged period of restraint" of Lee, and the crime's short duration "did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Emanuel, supra*, 17 Cal.5th at p. 886.)

The fourth factor is whether the defendant was aware of the codefendant's propensity for violence or likelihood of killing a victim. (*Clark, supra*, 63 Cal.4th at p. 621.) This factor overlaps the third *Banks* factor, and we incorporate our previous discussion of the substantial evidence from which a reasonable factfinder could conclude that appellant knew there was some likelihood of violence. Appellant contends that "[m]ore telling was the shock and surprise appellant expressed at the shooting during his conversation with Melvin in the police car after their arrest," which "shows that appellant did not harbor a reckless indifference to human life." We are disinclined to ascribe particular emotions to the cold record of the transcript or give such emotions controlling weight in our analysis; "the cold record seldom captures indications like facial expressions, tones of voice, or hesitancy." (*People v. Poore* (2022) 13 Cal.5th 266, 297.) Appellant's words speak for themselves, and they support the inference that appellant recognized it was dangerous for Melvin to handle the gun and proceeded with the crime regardless. That said, they do not necessarily indicate that appellant foresaw or intended the violent manner in which the robbery ultimately unfolded, or that he disregarded the risk of death in a grossly deviant fashion. (See *Emanuel, supra*, 17 Cal.5th at p. 884.)

The final *Clark* factor is the defendant's efforts to minimize the risk of violence during the felony. "Efforts at the planning

stage to minimize the potential for violence . . . are viewed as a distinct factor from efforts to restrain confederates once the felony is underway." (*Emanuel*, *supra*, 17 Cal.5th at pp. 887-888.)  There need not be direct evidence that the felony was planned with the express purpose of minimizing violence; "circumstantial evidence regarding the plan itself may suffice." (*Id.* at p. 887.)  Additionally, "the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony." (*Id.* at p. 888.)  *Emanuel* also teaches that a defendant's failure to prevent the underlying felony is of minimal import, because "[p]articipation in the underlying felony is presupposed but no longer sufficient to impose murder liability." (*Id.* at pp. 888-889.)

In *Clark*, efforts to minimize violence included planning to use an unloaded gun and scheduling the robbery when the store was closed to minimize risks to employees.  (See *Clark*, *supra*, 63 Cal.4th at pp. 621-622.)  In *Emanuel*, those efforts included planning an unarmed robbery of the victim "in a public location during daylight hours," "in the open where witnesses might be present to observe. . . ." (*Emanuel*, *supra*, 17 Cal.5th at p. 887.)  *Emanuel* also contrasted those efforts with a hypothetical defendant who "plans to commit an armed home invasion robbery at 3:00 a.m., with knowledge of several armed occupants and a methamphetamine operation within." (*Id.* at p. 889.)  In the latter case, "a trier of fact might reasonably conclude that the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is graver than the risk of violence inherent in any violent felony." (*Ibid.*)

Appellant contends his efforts to minimize violence included attempts to talk Melvin out of committing the robbery and taking no action "that increased the risk of violence beyond the risk inherent in Melvin carrying a loaded gun into the store to obtain money." He also points to the Supreme Court's statement that he and Melvin "waited near the store for customers to leave" before entering, reiterates his claim that Melvin stole the money, and asserts that his immediate flight from the scene did nothing to heighten the danger to Lee. In an apparent attempt to analogize the case to *Emanuel*, he asserts multiple times in his supplemental brief that the robbery, which took place shortly before 8:00 p.m., occurred "during the daytime."

Although the crime did not take place during the day, only Lee was present when appellant and Melvin entered the small store. Several witnesses were nearby, and appellant and Melvin did not conduct themselves in a particularly discreet fashion or attempt to conceal their intentions from bystanders. Most importantly, the objective circumstances of the planned crime do not suggest a risk of violence in excess of that inherent in a typical armed robbery. The trial court's reliance on appellant's involvement in the planning, awareness of the gun, and apparent lack of concern toward Lee to conclude otherwise accordingly was misplaced. (See *Emanuel*, *supra*, 17 Cal.5th at p. 896 ["such a mechanical focus on unsuccessful or inadequate efforts at restraint risks imposing murder liability based solely on a defendant's participation in an underlying felony in which a death occurs"].)

The trial court did, however, appropriately consider appellant's youthful age at the time of the crimes. At trial,

30

appellant cited his lack of "maturity" as a reason he believed he could prevent injury by accompanying Melvin during the robbery. In his appellate briefing, he characterizes himself as "a scared and angry 15-year-old who, having joined his 15-year old cousin in a planned robbery after failing to talk him out of it, saw his cousin inexplicably shoot the store owner in the head seconds after entering the store." Citing *Moore, supra*, 68 Cal.App.5th 434, *Keel, supra*, 84 Cal.App.5th 546, and *Ramirez, supra*, 71 Cal.App.5th 970, he contends his "youth significantly undercuts any argument that appellant acted with reckless indifference to human life."

Appellant's age at the time of the offense is relevant to whether he acted with reckless indifference. Case law in this area recognizes that youth are relatively more impulsive than adults and may be vulnerable to peer pressure. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.) It further recognizes that teens in particular lack the experience, perspective, and judgment "to adequately appreciate the risk of death posed by [their] criminal activities." (*Moore, supra*, 68 Cal.App.5th at p. 454.)

The trial court concluded appellant was "not an unsophisticated typical 15 year old" because he said he should have carried the gun, was aware that Melvin shot Lee in the face, and expressed concern about the consequences he and Melvin faced after they were apprehended. While these facts reflect some insight and maturity, they do not show that appellant subjectively appreciated the risk of death posed by the robbery. (See *Emanuel, supra*, 17 Cal.5th at pp. 884, 895.) The crucial question is whether the totality of the circumstances shows that appellant was aware, before the murder occurred, that he was knowingly creating a grave risk of death. (*Emanuel, supra*, 17

31

Cal.5th at p. 884.)  On balance, the *Clark* factors, particularly when "viewed from the lens of [appellant's] youth" (*Moore*, *supra*, 68 Cal.App.5th at p. 454), indicate that the answer to that question here is no.  Appellant and Melvin set out to commit a garden-variety armed robbery of a small store.  Their plans did not elevate the risk to human life beyond those inherent in any armed robbery.  "The crime unfolded without a prolonged period of restraint." (*Emanuel*, *supra*, at pp. 895-896.)  Melvin shot Lee without warning shortly after he and appellant entered the store, and they fled within seconds without hampering Lee's ability to obtain aid from nearby bystanders.  Appellant's participation in the planning and commission of the robbery and failure to render aid to Lee do not demonstrate that he acted with the requisite reckless indifference to human life to be culpable of murder.

## DISPOSITION

The order of the trial court is reversed.  The matter is remanded to the trial court with directions to grant appellant's petition for resentencing, vacate his murder conviction, and resentence him.  (See § 1172.6, subds. (d)(3), (e).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


ZUKIN, P. J.                                        MORI, J.